**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Joseph A. FRATES, et al., Defendants.**

**No. 93–CV–123–H(J).**

United States District Court,
N.D. Oklahoma.

March 30, 1999.

Frederic Dorwart, Jean Michael Medina, Fred Dorwart, Lawyers, Tulsa, OK, Paul DeMuro, Frederic Dorwart Laywers, Tulsa, OK, for Joseph A. Frates, defendant.

Thorn Huffman, San Antonio, TX, pro se.

James William Tilly, Craig Alan Fitzgerald, Tilly & Associates, Tulsa, OK, for David L. Fist, defendant.

Steven W. Simcoe, Kara Marie Dorssom, Barkley Rodolf, Tulsa, OK, Jeffrey C. Sacra, Holden Glendening & Turnbull, Tulsa, OK, for C. Michael Barkley, defendant.

William R. Turnbow, Andrew G. Lewis, Hershner Hunter Moulton Andrews & Neill, Eugene, OR, Carolyn Ann Arthur, Resolution Trust Corp., Dallas, TX, for Federal Deposit Insurance Corporation, counter-defendant.

Frederic Dorwart, Jean Michael Medina, Fred Dorwart, Lawyers, Tulsa, OK, for Joseph A. Frates, counter-claimant.

### ORDER

HOLMES, District Judge.

This matter comes before the Court on the Report and Recommendation of the United States Magistrate Judge (Docket # 392) with respect to Plaintiff's First Motion for Summary Judgment (Docket # 178), Plaintiff's Cross–Motion for Summary Judgment (Docket # 369), and Defendant Joseph A. Frates' Second Motion for Summary Judgment on Counts I and II (Docket # 356). Both Plaintiff and Defendant have filed objections to the report and recommendation and have filed responses to the objections.

When a party objects to the report and recommendation of a Magistrate Judge, Rule 72(b) of the Federal Rules of Civil Procedure provides in pertinent part that:

[t]he district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommendation decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Fed.R.Civ.P. 72(b).

Based upon a careful review of the Report and Recommendation of the Magistrate Judge, the objections and responses of the parties, and the record, the Court finds that the Report and Recommendation granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motions for Summary Judgment should be, and is hereby, adopted. Plaintiff's First Motion for Summary Judgment (Docket # 178) and Plaintiff's Cross–Motion for Summary Judgment (Docket # 369) are hereby denied. Defendant Joseph A. Frates' Second Motion for Summary Judgment on Counts I and II (Docket # 356) is hereby granted.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

JOYNER, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................... 1185
 A. EQUIVEST'S ACQUISITION OF STATE ........................................ 1185
 B. THE PLAYERS ................................................... 1185
 C. THE SIERRA PROPERTY AND THE KAISER LITIGATION ......................... 1186
 D. SUMMARY OF THE FDIC'S CLAIMS ........................................ 1187
 1. First for Relief—Mr. Frates' Obligation to Contribute Additional Capital to State Pursuant to The Personal Guaranty Imposed on Him By Condition 7 of FHLBB Resolution 86–1296 .................. 1187
 2. Second Claim for Relief—Mr. Frates' Breach Of An Oral Agreement to Indemnify State Against Loss In Connection With the Sierra Property and the Kaiser Litigation ................................. 1188
II. FIRST CLAIM FOR RELIEF — MR. FRATES' OBLIGATION TO CONTRIBUTE ADDITIONAL CAPITAL TO STATE PURSUANT TO THE PERSONAL GUARANTY IMPOSED ON HIM BY CONDITION 7 OF FHLBB RESOLUTION 86–1296 ......................... 1188

A. HISTORICAL BACKGROUND OF THE SAVINGS AND LOAN INDUSTRY ............... 1188
 1. Statutory and Regulatory Framework Applicable to Federally Chartered and Federally Insured Savings and Loan Associations .......... 1188
 2. Savings and Loan Association Charter Conversions and The Acquisition of Savings and Loan Associations ........................... 1189
B. STATE'S CONVERSION TO A STOCK ASSOCIATION AND EQUIVEST'S ACQUISITION OF STATE ...... 1190
C. MR. FRATES CANNOT ATTACK THE FHLBB'S RESOLUTIONS ................... 1194
 1. This Court Lacks Subject Matter Jurisdiction to Entertain Mr. Frates' Objections to the FHLBB's Resolutions ...................... 1196
D. THE FDIC MAY ENFORCE THE FHLBB'S RESOLUTIONS ...................... 1199
 1. The Undersigned's Prior Order—Focusing the Dispute ............... 1199
 2. The FHLBB's Resolutions are Administrative Orders, Not Contracts.. 1200
 3. Enforcement of the FHLBB's Administrative Orders by the FDIC as the FSLIC ...... 1201
 a. *The FSLIC's Right to Enforce the Resolutions* .................. 1201
 b. *Statute of Limitations* ........................................... 1202
 4. Enforcement of the FHLBB's Administrative Orders by the FDIC as State ...... 1203
E. UNDER THE FHLBB'S RESOLUTIONS, MR. FRATES' OBLIGATION TO CONTRIBUTE ADDITIONAL CAPITAL TO STATE HAS NOT BEEN TRIGGERED ................. 1204
 1. The 5% Limit on Mr. Frates' Personal Guaranty .................... 1204
 a. *FDIC's Interpretive Arguments Based on Mr. Frates' Subjective Intent* ...... 1206
 b. *FDIC's Interpretive Arguments Based on the Language of the FHLBB's Resolutions* ...... 1208
 c. *Calculation of the 5% Limit On Mr. Frates' Personal Guaranty* .. 1209
 2. Timing of New Appraisals ........................................ 1210
F. CONCLUSION ......................................................... 1210
III. SECOND CLAIM FOR RELIEF — MR. FRATES' BREACH OF AN ORAL AGREEMENT TO INDEMNIFY STATE AGAINST LOSS IN CONNECTION WITH THE SIERRA PROPERTY AND THE KAISER LITIGATION ......................................... 1211
A. SUMMARY OF THE EVIDENCE ............................................ 1211
B. THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING THE EXISTENCE OF A PROMISE BY MR. FRATES AND/OR THE FRATES GROUP TO INDEMNIFY STATE AGAINST ANY LOSS AS A RESULT OF THE KAISER LITIGATION ................. 1219
C. THE PARTIES' ARGUMENTS IN FAVOR OF SUMMARY JUDGMENT AS A MATTER OF LAW ...... 1220
 1. The FDIC's Argument—*Dench and 12 U.S.C. § 1823(e)* .............. 1220
 2. Mr. Frates' Arguments ........................................... 1221
 a. *Contractual Validation* ........................................ 1221
 i. *The Consideration Doctrine* ................................. 1221
 ii. *The Promissory Estoppel Doctrine* .......................... 1222
 b. *Statute of Frauds* ............................................. 1224
 c. *No Showing of Superior Title and No Notice or Opportunity to Defend* ...... 1224
 d. *Indemnity Against Judgment and Failure to Mitigate Damages*.. 1225
 e. *No Prior Judgment Against the Frates Group* .................... 1226
 f. *No Damages Suffered by State* ................................. 1228
 g. *Terms of Indemnity Agreement Not Definite* .................... 1228
D. CONCLUSION ......................................................... 1229
RECOMMENDATION ......................................................... 1229
OBJECTIONS.............................................................. 1229

The following motions are now before the Court:

1. "Plaintiff's First Motion for Summary Judgment (Breach of Contract and Warranty Claims)," [Doc. No. 178]; [1]

---

1. The undersigned has considered the following items in connection with this motion:

Doc. No. 178 (FDIC's Brief), 179 (FDIC's Exhibits), 215 (Mr. Frates' Response), 216

2. "Defendant Joseph A. Frates' Second[2] Motion for Summary Judgment on Counts I and II," [Doc. No. 356];[3] and

3. "Plaintiff's Cross–Motion for Summary Judgment [regarding Mr. Frates' Second Motion for Summary Judgment on Counts I and II]," [Doc. No. 369].

All of these motions seek summary adjudication of the First and Second Claims For Relief in the Federal Deposit Insurance Corporation's ("FDIC") Third Amended Complaint. *See* Doc. No. 140. The First and Second Claims For Relief state causes of action solely against Defendant Joseph A. Frates.[4] The undersigned has thoroughly reviewed the parties' briefs and the evidentiary materials submitted. The undersigned offers this report and recommends that Mr. Frates' motions for summary judgment be *GRANTED* and the

FDIC's motions for summary judgment be *DENIED.*

As to the First Claim for Relief the undersigned finds that Mr. Frates had an enforceable obligation to personally guarantee Equivest Financial Corporation's ("Equivest") obligation to contribute additional capital to State Federal Savings and Loan Association ("State"), but that Mr. Frates' obligation was not triggered because a contribution was not necessary to raise State's regulatory capital to 5% of State's total liabilities as of December 30, 1986. As to the Second Claim for Relief, the undersigned finds that even if Mr. Frates in fact promised to indemnify State against any loss suffered in connection with the Sierra Gateway property, that promise is not enforceable through an action at law because Mr. Frates' promise cannot be validated under either the doc-

---

(Mr. Frates' Exhibits, Vol. 1), 217 (Mr. Frates' Exhibits, Vol. 2), 222 (FDIC's Reply), 293 (FDIC's Supplement), 294 (Mr. Frates' Surreply), 300 (FDIC's Supplement), 319 (Affidavit of Thorn Huffman), 341 (FDIC's Supplement), 342 (Mr. Frates' Supplement), 384 (FDIC's 5% Calculation Brief), 385 (FDIC's Supplemental Brief), 387 (Mr. Frates' 5% Calculation Brief), and 391 (Mr. Frates' Supplemental Brief). Volume 1 of Mr. Frates' exhibits contains affidavits by Thorn Huffman and Robert E. Merrick. *See* Doc. No. 216, Exhibits 7 and 13. Portions of ¶¶ 9 and 10 of Mr. Huffman's affidavit and portions of ¶ 10 of Mr. Merrick's affidavit were stricken by the undersigned upon motion by the FDIC. *See* Doc. No. 381.

**2.** This motion is styled as Mr. Frates' second motion for summary judgment because Mr. Frates alleges that his response to Plaintiff's first motion for summary judgment contains/is a cross-motion for summary judgment. *See* Doc. No. 215. The FDIC argues that Mr. Frates' response cannot serve as a cross motion for summary judgement. The undersigned need not resolve the issue. Given the nature of all the pleadings filed in this case, including Mr. Frates' second motion for summary judgment, the undersigned finds that Mr. Frates and the FDIC have each moved for summary judgment in their respective favors on the First and Second Claims for Relief stated in the Third Amended Complaint.

**3.** The undersigned has considered the following items in connection with this motion: Doc. No. 356 (Mr. Frates' Motion), 360 (Mr. Frates' Brief), 364 (Mr. Frates' Corrected Brief), 357 (Mr. Frates' Exhibits, Vol. 1), 358 (Mr. Frates' Exhibits, Vol. 2), 365 (Mr. Frates' Errata to Exhibits), 370 (FDIC's Response), 371 (FDIC's Exhibits, Vol. 1), 372 (FDIC's Exhibits, Vol. 2), 377 (Mr. Frates' Reply), and 379 (FDIC's Reply).

**4.** All defendants in this lawsuit, except Joseph A. Frates, David L. Fist and C. Michael Barkley, have been dismissed. *See* Doc. Nos. 109, 110, 334, 336 and 351. The Third Amended Complaint contains eight claims. The First and Second Claims are stated against Mr. Frates only, and those claims are the subject of this Report and Recommendation. The Third through the Eighth Claims are stated against Messrs. Frates, Fist and Barkley. *See* Doc. No. 140. Messrs. Frates, Fist and Barkley have also filed counterclaims against the FDIC in connection with the Third through the Eighth Claims. *See* Doc. Nos. 201–203. All parties, including Mr. Frates, have settled the Third through the Eighth Claims and the counterclaims, subject to approval of the settlement by FDIC officials in Washington, D.C. Thus, the adoption of this Report and Recommendation and the approval of the pending settlement would resolve all pending claims in this lawsuit.

trine of consideration or the doctrine of promissory estoppel.

# I. INTRODUCTION

## A. EQUIVEST'S ACQUISITION OF STATE

By the mid–1980's the savings and loan industry was in serious trouble and on the verge of collapse. Prior to the late 1970's, savings and loan associations were granting long-term, fixed-rate mortgages at very low interest rates. When interest rates and inflation rose significantly in the early 1980's, savings and loan associations were forced to increase the interest rates they offered to attract depositors. When the cost of these high interest, short-term deposits overtook the revenues from the low interest, long-term mortgages, many savings and loan associations began losing money at an alarming rate. Approximately 435 thrifts failed between 1981 and 1983. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 2440–41, 135 L.Ed.2d 964 (1996).

The thrift industry in Oklahoma was not immune. During the 1980's, most savings and loan associations in Oklahoma failed or became insolvent. State Federal Savings and Loan Association, located in Tulsa, Oklahoma, was no exception. By the summer of 1986, State was insolvent and it was a candidate for a receivership which would be very costly to the Federal Savings and Loan Insurance Corporation ("FSLIC").

Realizing that the FSLIC lacked sufficient funds to liquidate the failing thrifts, the Federal Home Loan Bank Board ("FHLBB") sought to avoid insurance liability by encouraging outside investors to take over failing savings and loan associations like State. *Winstar*, 116 S.Ct. at 2442. Defendant, Joseph A. Frates, was one such investor. Mr. Frates and others formed Equivest Financial Corporation as a holding company to acquire State. Pursuant to an Acquisition Agreement between State and Equivest, State was to convert from a mutual form of ownership to a stock form of ownership. In exchange for 100% of State's newly-acquired stock, Equivest was to convey to State real property worth at least $27.4 million ("the Contributed Property"). *See* Doc. No. 179, Bates # 4967–5007. Equivest's obligation to acquire State was subject to approval of all relevant applications by the FHLBB "without material modification." *Id.* at ¶ 1.1.

On December 30, 1986, when Equivest officially acquired State, Equivest conveyed several parcels of real property to State in exchange for 100% of State's stock.[5] One of the parcels of property conveyed by Equivest to State is known as the Sierra Gateway property ("Sierra property") located in Fontana, California. Mr. Frates owned an interest in the Sierra Gateway property which he conveyed to Equivest on December 29, 1986.

Equivest operated State from December 30, 1986 to February 16, 1990. On February 16, 1990, the Office of Thrift Supervision ("OTS") declared State insolvent and appointed the Resolution Trust Company ("RTC") as State's receiver

## B. THE PLAYERS

Mr. Frates contributed his interest in the Contributed Property and $1,166,000 to capitalize Equivest. Mr. Frates held 100% of Equivest's voting/common stock, which he acquired for $1,000,000, and .4% percent of the preferred stock, which he obtained for $166,000. The majority of the preferred stock in Equivest was owned by Mr. Frates' immediate family—his daughter, son-in-law and sons. *See* Doc. No. 179, Bates # 5462. Mr. Frates also served as president and chief executive officer for Equivest, until January 10, 1987 when Thorn C. Huffman replaced Mr. Frates as president of Equivest. Mr. Frates contin-

---

**5.** The Contributed Property was actually conveyed to Woodmeadow Homes, Inc., a wholly-owned subsidiary of State. *See* Doc. No. 216, Exhibit 32. For simplicity, when the reference "State" is used, it refers to State and its wholly-owned subsidiaries.

ued to serve as chairman of Equivest's board of directors after January 10, 1987.

Mr. Frates was an active part of the senior management of both State and Equivest, State's holding company. Upon Equivest's acquisition of State at the end of 1986, Mr. Frates became the vice-chairman of State's board of directors. On February 18, 1987, Mr. Frates became State's chief executive officer and chairman of State's board of directors. Mr. Frates resigned his CEO and chairman positions on June 30, 1987, but continued to serve as a member of State's board of directors until October 31, 1989.

Thorn Huffman acted as an advisor and a negotiator on behalf of Equivest and assisted in Equivest's acquisition of State. Mr. Huffman was a director for Equivest and on January 10, 1987, Mr. Huffman replaced Mr. Frates as president of Equivest. Mr. Frates remained as Equivest's Chairman of the Board. As president of Equivest, Mr. Huffman served as Equivest's liaison to State's board of directors from early January 1987 to January 1989. Mr. Huffman then became State's chief executive officer and chairman of the board. Mr. Huffman resigned from Equivest's board on May 19, 1989.

At all relevant times, Max K. Naegler served as a director, officer and general counsel for Equivest. Mr. Naegler also served as vice president and secretary for Equivest. Mr. Naegler conducted the closing of Equivest's acquisition of State. Mr. Naegler also acted as counsel under the direction of Robert Merrick for various other Frates-related entities. Mr. Frates had entrusted his personal affairs to Mr. Naegler, as a lawyer, and to Robert Merrick, as a business adviser. Doc. No. 371,

Frates Deposition, p. 7, ln. 22 to p. 8, ln. 18; p. 21, ln. 25 to p. 22, ln. 8; and pp. 163–64.

Robert Merrick was a business associate of Mr. Frates and he was involved in several separate business enterprises with Mr. Frates. Mr. Merrick worked for the "Frates organization" from 1975–1990. A company by the name of Equivest Management Company was formed to provide centralized management functions for the various Frates organizations. Mr. Merrick was the president of that management company. In effect, Mr. Merrick was something akin to the chief operating officer of the "Frates organization," which was not one single entity, but a number of different businesses. Pertinent to this case, Mr. Merrick was a shareholder in Equivest and, before the Acquisition Agreement between State and Equivest was closed, he was the principal negotiator on behalf of the Equivest investors with the FHLBB. According to Mr. Huffman, Mr. Merrick was Mr. Frates' agent, with the authority to negotiate on Mr. Frates' behalf, bind Mr. Frates personally, and generally conduct Mr. Frates' business affairs. Doc. No. 371, Huffman Deposition, p. 256, ln. 11 to p. 257, ln. 7. Mr. Frates testified that he never authorized Mr. Huffman, Mr. Naegler or Mr. Merrick to negotiate with the FHLBB on his behalf. *Id.* Frates Deposition, p. 34, ln. 14–20.

## C. THE SIERRA PROPERTY AND THE KAISER LITIGATION

Mr. Frates obtained his interest in the Sierra property through his involvement with a group of investors known as the Frates Group.[6] In 1983, the Frates Group

---

**6.** The "Frates Group" is not consistently described in the record. Robert Merrick defines the group as consisting of the following individuals: Charles S. Holmes, Stanley P. Doyle, P. Peter Prudden, Ramona F. Prudden, J. Anthony Frates, Stephen I. Frates, Robert Merrick, and Mr. Frates. Doc. No. 216, Affidavit of Robert E. Merrick, Exhibit 7, ¶ 11. Max Naegler defines the group of consisting

of all of these same individuals, except Ramona F. Prudden. *Id.* Affidavit of Max Naegler, Exhibit 15, ¶ 4. Mr. Frates defines the group as all of the individuals identified by Mr. Merrick, except Ramona F. Prudden and Robert Merrick. From the relevant grant deeds one might define the "Frates Group" as consisting of the individuals identified by Mr. Merrick, plus Beverly J. Merrick, Candace G.

acquired a controlling interest in Kaiser Steel Corporation ("Kaiser"). Mr. Frates served as chairman of Kaiser's board of directors from February 1984 to April 1985.

In 1985, Kaiser owned the Sierra property. Through a series of exchanges, not relevant here, the Sierra property was divided between the individual investors that made up the Frates Group. Mr. Frates, as a member of the Frates Group, obtained a 1.1844% share of the Sierra property as a tenant in common with the other owners of the Sierra property.[7] It was this interest in the Sierra property which Mr. Frates eventually transferred to Equivest.

When Kaiser conveyed the Sierra property in 1985, Kaiser was undergoing a major refinancing. Kaiser eventually found itself in a Chapter 11 bankruptcy in 1987. In March 1987, three months after Equivest had acquired State, Kaiser filed a notice of *lis pendens* on the Sierra property in connection with an adversary proceeding Kaiser had initiated within its Chapter 11 bankruptcy. Kaiser alleged that the Sierra property transfer was an avoidable preference because the property was transferred for less than adequate consideration and that the transfer occurred when Kaiser was insolvent. The complaint in the adversary proceeding sought, among other things, a judgment voiding the transfer of the Sierra property. In effect, Kaiser was alleging that State did not have valid title to the Sierra property because the grantors (i.e., Mr. Frates and others) to State's grantor (i.e., Equi-

vest) did not have good title. State was eventually named as a party to the adversary proceeding and State entered an appearance to protect its interest in the Sierra property.

### D. SUMMARY OF THE FDIC'S CLAIMS

The pleadings filed in connection with the parties' motions for summary judgment stand almost three feet tall. The FDIC's claims can, however, be boiled down to the following:

1. **First Claim for Relief—Mr. Frates' Obligation to Contribute Additional Capital to State Pursuant to The Personal Guaranty Imposed on Him By Condition 7 of FHLBB Resolution 86-1296**

The FDIC alleges that:

(1) As a condition of the FHLBB's approval of State's application to convert to a stock form and Equivest's application to acquire control of State, Equivest was required to enter into an agreement with the FSLIC, and that agreement required Equivest

 (a) to guarantee that the Contributed Property would be worth at least $27.4 million net after new appraisals, and

 (b) to contribute additional capital if the new appraisals showed a net value of less than $27.4 million;

(2) As a condition of the FHLBB's approval, the FHLBB also required Mr. Frates to enter into an agree-

---

Frates, Johanna I. Frates and Karen K. Frates. *Id.* at Exhibit 17. Thus, the term "Frates Group" is inherently ambiguous whenever it is used in any document and the document does not explicitly define the individuals or entities who are members of the group. It appears, however, that whenever the term is invoked it is meant to include Mr. Frates.

7. When the Frates Group acquired the Sierra property, it formed a partnership named FG Associates to hold and manage the Sierra

property, and other properties. FG Associates originally held title to the Sierra property. However, shortly before Equivest was to acquire State, the Sierra property was transferred out of FG Associates and divided among the partners for income tax reasons. Pursuant to this division, Mr. Frates received a 1.1844% individual share of the Sierra property. *See* Doc. No. 371, Merrick Deposition, p. 9, ln. 13–16; p. 19, ln. 10–12; and Doc. No. 377, Exhibit 4, Merrick Deposition, pp. 72–73.

ment with the FSLIC personally guaranteeing Equivest's obligation to contribute additional capital;

(3) Knowing these conditions, Equivest and Mr. Frates consummated the acquisition of State and began operating State;

(4) Mr. Frates has failed and refused to sign the guaranty agreement he agreed he would sign; and

(5) New appraisals show a net value for the Contributed Property of less than $27.4 million.

The FDIC argues that (1) Mr. Frates has violated the FHLBB's resolutions by failing to contribute additional capital to State, (2) the FDIC can enforce Mr. Frates obligation to give a guaranty, and (3) the measure of damages for Mr. Frates' violation of the FHLBB's resolutions should be the difference between $27.4 million and the net value of the Contributed Property as shown by the new appraisals.

### 2. Second Claim for Relief—Mr. Frates' Breach Of An Oral Agreement to Indemnify State Against Loss In Connection With the Sierra Property and the Kaiser Litigation

The FDIC alleges that shortly after State learned of the Kaiser litigation and the *lis pendens* on the Sierra property, Mr. Frates made certain oral representations to State's board and the FHLBB. The FDIC argues that (1) Mr. Frates orally agreed to indemnify State against any loss State might suffer in connection with the Kaiser litigation; (2) that State suffered losses as a result of the Kaiser litigation; and (3) that Mr. Frates has breached his oral indemnification agreement by failing to compensate State for these losses.

## II. FIRST CLAIM FOR RELIEF—MR. FRATES' OBLIGATION TO CONTRIBUTE ADDITIONAL CAPITAL TO STATE PURSUANT TO THE PERSONAL GUARANTY IMPOSED ON HIM BY CONDITION 7 OF FHLBB RESOLUTION 86–1296

### A. HISTORICAL BACKGROUND OF THE SAVINGS AND LOAN INDUSTRY

### 1. Statutory and Regulatory Framework Applicable to Federally Chartered and Federally Insured Savings and Loan Associations[8]

After the Great Depression, the federal government began to actively regulate the entire financial services industry, including savings and loan associations. With three major pieces of legislation, the federal government assumed the dominant role in the regulation of the thrift industry. *See* The Federal Home Loan Bank Act of 1932 ("FHLBA"), 12 U.S.C. §§ 1421–1449; The Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1461–1470; and The National Housing Act of 1934 ("NHA"), 12 U.S.C. §§ 1701–1750g.

The FHLBA established the Federal Home Loan Bank System ("FHLBS"), consisting of twelve regional Federal Home Loan Banks with the Federal Home Loan Bank Board ("FHLBB") as its administrative head. *See* 12 C.F.R. § 500.32 (1986). The FHLBB was established by Congress as an independent agency in the executive branch of the government. 12 U.S.C. § 1437(b). The Chairman of the Bank Board was the chief federal regulator of the savings and loan industry. Congress created the FHLBS to rescue the failing, post-depression thrift industry. Congress hoped to achieve this goal by allowing savings and loan associations to become voluntary members of the FHLBS and receive loans, collateralized by their mortgage portfolios, from the Federal Home Loan Bank in their region. A year

---

**8.** The discussion in this section, regarding the general history of the thrift industry and Congress' legislative initiatives, comes directly from Baxter Dunaway, *et al., FIRREA: Law* *and Practice,* Ch. 2 and 3 (1994) and *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

later, Congress enacted HOLA, which authorized the FHLBB to, among other things, charter and regulate federal savings and loan associations. *See* 12 C.F.R. § 500.3 (1986). Much of the day-to-day supervision of savings and loan associations was in fact carried out by employees of the regional Federal Home Loan Banks, pursuant to authority delegated to those employees by the FHLBB. *See* 12 C.F.R. §§ 500.10 and 501.11 (1986).

A year after HOLA was enacted, Congress enacted the NHA, which established the Federal Savings and Loan Insurance Corporation ("FSLIC") to insure deposits of federal and state chartered savings and loan associations. The FSLIC was created as a corporate instrumentality of the United States, operating under the direction of and according to the bylaws, rules and regulations established by the FHLBB. 12 U.S.C. §§ 1437(b), 1725(a), 1725(c), and 1730(k)(1). *See also* 12 C.F.R. § 500.4 (1986). The FHLBB is, therefore, the administrative and supervisory head of the FSLIC. As such, the FHLBB had supervisory authority over FSLIC-insured savings associations, including savings associations chartered under state law.

Under the regulatory regime ultimately created by Congress, the FHLBB became responsible for administering the FHLBA, HOLA and NHA. 12 C.F.R. § 500.1 (1986). The FHLBB was responsible for (1) chartering, examining and supervising federal savings and loan associations; (2) administering the FSLIC's deposit insurance responsibilities, including examining and supervising any FSLIC-insured institution, state or federal; and (3) supervising the provision of credit and other services provided by the regional Federal Home Loan Banks. The consolidation of these functions in one agency created potential conflicts of interest which in part led Congress to enact the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and restructure the regulatory framework within which the thrift industry operates.

### 2. Savings and Loan Association Charter Conversions and The Acquisition of Savings and Loan Associations

Initially, HOLA provided for only one form of federal charter—the mutual form. Mutual savings and loan associations have no stockholders. They are operated for the mutual benefit of their depositors and it is the depositors who elect the board of directors. "Nominally the [depositors] own the mutual [association], but it is ownership in name only. [The depositors] cannot sell what they 'own,' and if they withdraw savings they receive only the nominal value of the account rather than a portion. of the mutual's net worth, which is valuable to them only to the extent it permits the bank to pay higher interest.... Increasing competition among financial institutions has led to pressure to replace the mutual form with a stock form that assigns ownership interests more explicitly and makes them transferable." *Ordower v. Office of Thrift Supervision*, 999 F.2d 1183, 1185 (7th Cir.1993).

Congress amended HOLA in 1948 to permit federal mutual associations to convert to stock associations. In a conversion, the mutual association exchanges its mutual charter for a stock charter. The new stock association then issues stock to investors, and the investors become the owners of the association. *See Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 615–16 (2nd Cir.1997) (for a historical overview of Congress' treatment of federal charter conversions).

Prior to FIRREA, the FHLBB regulated and the FSLIC insured savings and loan associations. Banks were separately regulated and they were insured by the FDIC. FIRREA created the Office of Thrift Supervision and abolished the FHLBB and the FSLIC. The OTS was vested with the FHLBB's power to regulate savings and loan associations and the FDIC assumed the FSLIC's insurance functions. Thus, FIRREA, consolidated

the regulation and insurance of banks and savings and loan associations.

FIRREA's amendments became effective August 9, 1989. State was declared insolvent and the RTC was appointed as State's receiver on February 16, 1990. State's receivership and this litigation occurred after the passage of FIRREA and FIRREA's new rules have been applied to State's receivership and this litigation. *See* Doc. Nos. 159, 246 and 337. Nevertheless, Equivest acquired State in 1986 before the passage of FIRREA. Consequently, the FHLBB, and not the OTS, was the agency with regulatory authority over State at the time Equivest acquired State. The undersigned will, therefore, evaluate State's charter conversion and Equivest's acquisition of State under the pre-FIRREA regulatory framework.

When Equivest acquired State in December 1986, State was a federally chartered depository institution, whose deposits were insured by the FSLIC. Under the law in December 1986, no savings and loan association, whose deposits were insured by the FSLIC, could convert itself from a mutual association to a stock association unless the association filed an application in accordance with the rules and

regulations of the FHLBB/FSLIC and obtained approval of the conversion from the FHLBB/FSLIC. 12 U.S.C. §§ 1464(*l*)(2) and 1725(j)(1).[9] Also under the law in December 1986, it was unlawful, except under circumstances not relevant here, for a company that was not already a savings and loan holding company[10] to acquire control of a savings and loan association, whose deposits were insured by the FSLIC, without filing an application and obtaining prior, written approval of the acquisition by the FSLIC. 12 U.S.C. §§ 1730(q) and 1730a(e)(1)(B).[11]

**B. STATE'S CONVERSION TO A STOCK ASSOCIATION AND EQUIVEST'S ACQUISITION OF STATE**

On July 31, 1986, State filed an "Application for Voluntary Conversion" with the FHLBB and the FSLIC. *See* Doc. No. 179, Bates # 5007–5036. State sought to convert itself from the mutual form to the stock form. State communicated about its application with the staff at the Federal Home Loan Bank of Topeka ("Topeka FHLB"), which was the regional Federal Home Loan Bank servicing State. *Id.* at Bates # 5048–49, 5079–82, 5094–98, 5100–5102, and 5106. The FHLBB, as the oper-

---

9. The relevant portion of § 1464, which is part of the act that created the FHLBB, provides that "[s]ubject to the rules and regulations of the [FHLBB], any Federal association may convert itself from the mutual form to the stock form of organization. . . ." 12 U.S.C. § 1464(i)(2). The relevant portion of § 1725, which is part of the act that created the FSLIC, provides that "[e]xcept as provided in section 1464 of this title, no insured institution may convert itself from the mutual to the stock form except in accordance with the rules and regulations of the [FSLIC]." 12 U.S.C. § 1725(j)(1). *See also* 12 C.F.R. §§ 552.2–5 and 563b.20–563b.32 (1986) (regulations governing voluntary, supervisory conversions from a mutual to a stock form). These regulations authorize the FHLBB to impose any conditions it sees fit on the approval of a conversion application. *Id.* at § 563b.29.

10. *See* 12 U.S.C. § 1730a(1)(D) and 1730a(2) (defining savings and loan holding company).

11. The relevant portion of § 1730a, which is part of the act that created the FSLIC, provides as follows:

It shall be unlawful for any other company, without prior written approval of the [FSLIC], directly or indirectly, or through one or more subsidiaries or through one or more transactions, to acquire the control of one or more insured institutions. . . . The [FSLIC] shall approve an acquisition of an insured institution under this subparagraph unless it finds the financial and managerial resources and future prospects of the company and institution involved to be such that the acquisition would be detrimental to the institution or the insurance risk of the [FSLIC], and shall render its decision within ninety days after submission to the [FHLBB] of the complete record on the application.

12 U.S.C. § 1730a(e)(1)(B). *See also* 12 C.F.R. §§ 574.1–574.8 (1986) (for the regulations governing acquisitions of control).

ating head of the FSLIC, approved the application, with certain conditions, on December 30, 1986. *See* FHLBB Resolution 86–1295, Doc. No. 179 as Bates # 7963–7967. Of particular relevance to this lawsuit, the FHLBB imposed the following condition on its approval of State's conversion application:

[**Condition 6 of the Conversion Resolution**]

The real property invested in State by Equivest shall be initially recorded by State at an aggregate value of not more than the Applicant's appraisal furnished to the Federal Home Loan Bank of Topeka, ('Topeka Bank') ('original valuation'), subject to revaluation as follows. An appraisal comporting with Memorandum R 41c, shall be made of all properties ('new appraisal') within a period of six months, unless extended for up to three months by the [Principal Supervisory Agent] for good cause shown. The appraisal shall be performed by an independent MAI-certified appraiser selected in the sole discretion of the [Principal Supervisory Agent] and with the concurrence of the [Office of Regulatory Policy, Oversight and Supervision], and paid for by the Topeka Bank, to be reimbursed by Equivest within 30 days of a demand. The contributed real estate shall be revalued to the value established by this new appraisal and any difference between $27.4 million net value and the new appraisal shall be infused by Equivest and guaranteed by Frates pursuant to stipulations entered into by Equivest and J.A. Frates under Condition 7 of Board Resolution 86–1296 [i.e., Condition 7 of the Acquisition Resolution.]

*Id.* at Condition 6 under *Supervisory Conversion of State*, pp. 2–3.

On July 31, 1986, Equivest filed an application with the FSLIC for permission to acquire control of State. Equivest amended its application once. *See* Doc. No. 357, Exhibit 3. Equivest also communicated about its application with the staff at the Topeka FHLB. *See* Doc. No. 179, Bates # 5048–49, 5079–82, 5094–98, 5100–5102, and 5106. The FHLBB, as the operating head of the FSLIC, approved Equivest's application, with certain conditions, on December 30, 1986. *See* FHLBB Resolution 86–1296, Doc. No. 179 as Bates # 7068–7071. Of particular relevance to this lawsuit, the FHLBB imposed the following condition on its approval of Equivest's acquisition application:

[**Condition 7 of the Acquisition Resolution**]

Within thirty days of the acquisition, Equivest and J.A. Frates, personally, shall stipulate to the [FSLIC] that, if the appraisal required in Condition 6 of *'Supervisory Conversion of State'* in Board Resolution No. 86–1295 ('Condition 6') [i.e., Condition 6 of the Conversion Resolution], values the contributed real estate at less than a valuation of $27.4 million net, then Equivest will cause to be contributed to State assets, in a form and valued at appraisals approved by the [Principal Supervisory Authority], equal to or greater than the difference between the new appraisal value and $27.4 million net; this contribution shall be guaranteed personally by Mr. Frates to the extent needed to bring State's regulatory capital to at least 5% of liabilities; and that Equivest and Mr. Frates shall cause the required asset contributions to be made within 30 days of recording any reductions in the value of the contributed properties[.]

*Id.* at Condition 7, p. 3.

State and Equivest negotiated with the staff at the Topeka FHLB up until December 29, 1986. Early in the day on Tuesday, December 30, 1986, Equivest and State communicated on the phone with the FHLBB's Office of General Counsel and they were told on the phone what the FHLBB's Office of General Counsel thought would be in the resolutions passed by the FHLBB. The Conversion and Acquisition Resolutions (i.e., Resolutions 86–1295 and 86–1296) were actually approved by the FHLBB in the afternoon on De-

cember 30, 1986. After learning that the FHLBB had approved the conversion and acquisition applications, Equivest and State closed the Acquisition Agreement between themselves in the late afternoon of December 30, 1986 by transferring State's stock to Equivest and Equivest's property to State.[12] Equivest and State closed the Acquisition Agreement, operating under the assumption that the resolutions actually passed by the FHLBB contained the terms communicated to them by the FHLBB's Office of General Counsel. Neither Equivest nor State reviewed the resolutions actually passed by the FHLBB prior to the closing.

Once Equivest and State received copies of the resolutions actually passed by the FHLBB, they began objecting, through Charles W. Petty, regulatory counsel for State and Equivest, to the conditions the FHLBB had imposed on the approval of the conversion and acquisition applications. Essentially, Equivest and State argued that the resolutions actually passed by the FHLBB contained terms which were materially different from those which had been discussed with the staff at the Topeka FHLB and with the staff at the FHLBB's Office of General Counsel, and that the terms were different from those than had been communicated on the phone to Equivest and State by the Office of General Counsel on the morning of December 30, 1986. Staff at the Topeka FHLB admitted that the resolutions contained terms different from what had been discussed between State, Equivest and the Topeka FHLB staff. The Topeka FHLB staff tried to have the resolutions changed. Ultimately, the FHLBB refused to accept all of the changes recommended by its Office of General Counsel and the Topeka FHLB staff. *See* Doc. No. 216, Exhibit 15.

State and Equivest wanted the following terms changed:

1. When State filed its conversion application in July 1986, the FHLBB was using Memo R–41b, issued by the FHLBB's Office of Examinations and Supervision, as the appraisal standard to be used for FSLIC-insured institutions. In September 1986, the FHLBB's Office of Examinations and Supervision issued Memo R–41c as the new appraisal standard to be used for FSLIC-insured institutions. Memo R–41c became effective in November 1986. When the FHLBB approved State's conversion application in December 1986, the FHLBB required that the Contributed Property be reappraised using Memo R–41c, not R–41b. *See* FHLBB Resolution 86–1295, Condition 6. Memo R–41c was withdrawn by the FHLBB and replaced with 12 C.F.R. § 563.17–1a, which became effective January 7, 1988. State and Equivest argued that R–41b or § 563.17–1a, not Memo R–41c, should be used to reappraise the Contributed Property. *See* Doc. No. 372 for a copy of Memos R–41b and R–41c.

2. When the FHLBB approved Equivest's acquisition application, it required Equivest to contribute additional capital to the extent reappraisal of the Contributed Property was less than $27.4 million. *See* FHLBB Resolution 86–1296, Condition 7. State and Equivest argued that Equivest's obligation to contribute additional capital should be offset by any gain State actually realized from the sale of any of the Contributed Property.

---

12. All parties were anxious for Equivest to complete its acquisition of State prior to December 31, 1986. Changes to the Internal Revenue Code taking effect on January 1, 1987 would limit the ability of any purchaser of State to use State's $1.2 to $1.5 million in net operating losses. Doc. No. 357, Exhibit 6, Huffman Deposition, p. 21, ln. 17 to p. 22, ln. 16. These tax consequences would have materially and adversely affected State's financial position and made it less likely that State could be successfully acquired by an investor.

3. When the FHLBB approved State's conversion application, the FHLBB required Equivest to operate State in accordance with the Business Plan submitted with the application. *See* FHLBB Resolution 86–1295, Condition 8, and FHLBB Resolution 86–1296, Condition 13. State and Equivest argued that this condition should be removed because it made it impossible to establish to the satisfaction of investors that State was validly existing and in good standing with the FHLBB.

4. When the FHLBB approved Equivest's acquisition application, the FHLBB required that Equivest agree to maintain State's regulatory capital at a level equal to the greater of 5% of State's total liabilities or a level consistent with that required by 12 C.F.R. § 563.13(b). If State's regulatory capital fell below these requirements, Equivest was required to infuse sufficient additional capital to achieve compliance. *See* FHLBB Resolution 86–1296, Condition 5. State and Equivest argued that the 5% minimum set forth in Condition 5 should be 3%.

*See, e.g.,* Doc. No. 217, Exhibit 63 (a copy of a January 19, 1988 letter to the FHLBB from Charles W. Petty, regulatory counsel for State and Equivest).

On April 4, 1989, the FHLBB acted on Equivest's and State's requests for modification of the December 30, 1986 resolutions. The FHLBB passed Resolution 89–1307—the Amending Resolution. *See* Doc. No. 179, Bates # 5808–5815. The Amending Resolution resolved State's and Equivest's requests as follows:

1. The FHLBB attached an appraisal standard to the resolution and required that the attached appraisal standard be used to re-appraise the Contributed Property. The appraisal standard attached to the Amending Resolution is substantially similar to Memorandum R–41b used by the FHLBB.

2. With certain conditions, the FHLBB granted the request to offset Equivest's obligation to contribute additional capital with gains realized from the sale of any of the Contributed Property. One such condition was that Mr. Frates guarantee Equivest's obligation to maintain State's regulatory capital at the greater of 5% of total liabilities or the minimum regulatory capital requirements. This is the first time Mr. Frates had been asked to guarantee Equivest's obligation to maintain State's net worth, as opposed to Equivest's obligation to contribute additional capital if new appraisals showed a value for the Contributed Property of less than $27.4 million net. The obligation was conditional. If Equivest wanted to use the gains received by State from the sale of the Contributed Property, Mr. Frates was going to have to guarantee Equivest's obligation to maintain State's net worth.

3. The FHLBB approved State's and Equivest's requested change regarding the operation of State in accordance with the Business Plan attached to the original application.

4. The FHLBB denied the request to change State's minimum regulatory capital from 5% to 3% of State's total liabilities.

The FHLBB also substituted the following for Condition 6 in the original Conversion Resolution (i.e., Resolution 86–1295):

The real property invested in State by Equivest shall be initially recorded by State at an aggregate value of not more than the Applicant's appraisal furnished to the Federal Home Loan Bank of Topeka, ('Topeka Bank') ('original valuation'), subject to revaluation as follows. An appraisal comporting with guidelines specified by the [FHLBB], shall be made of all properties ('new appraisal')

within a period of six months, unless extended for up to three months by the [Principal Supervisory Agent] for good cause shown. The appraisal shall be performed by an independent MAI-certified appraiser selected in the sole discretion of the [Principal Supervisory Agent] and with the concurrence of the Office of Regulatory Activities, and paid for by the Topeka Bank, to be reimbursed by Equivest within 30 days of a demand. The contributed real estate shall be revalued to the value established by this new appraisal and any difference between $27.4 million net value and the new appraisal shall be infused by Equivest and guaranteed by J.A. Frates pursuant to stipulations entered into by Equivest and J.A. Frates under Condition 7 of Board Resolution No. 86–1296[.]

The only difference between this Condition and Condition 6 in the original Conversion Resolution is the appraisal standard to be used to re-appraise the Contributed Property. In the original Conversion Resolution, the FHLBB referred to Memo R–41c. In the Amending Resolution, the reference to Memo R–41c is replaced with "guidelines specified by the [FHLBB]," and appraisal guidelines were attached by the FHLBB to the Amending Resolution.

### C. Mr. Frates Cannot Attack the FHLBB's Resolutions.

■ Mr. Frates admits that he offered to personally guarantee Equivest's obligation to contribute additional capital if new appraisals of the Contributed Property showed a value of less than $27.4 million net. Mr. Frates argues, however, that he is not bound by the FHLBB's resolutions requiring him to guarantee Equivest's obligation because the FHLBB imposed conditions on its approval of State's conversion and Equivest's acquisition applications which were different from those conditions which were expected based on State's and Equivest's negotiations with the Topeka

FHLB and the FHLBB Office of General Counsel. As Mr. Frates puts it, "the FHLBB reneged on its agreements respecting the conditions of approval of the State Federal and Equivest applications to acquire control of State Federal." *See* Doc. No. 216, Exhibit 16, ¶ 4. *See also* Doc. No. 179, Bates # 5080–82, 5094–98, 5108–5110, 5265–73 and 5344–5346 (all establishing that Mr. Frates was offering in some form to enter into an agreement guaranteeing Equivest's obligation to contribute additional capital). Essentially, Mr. Frates argues that he never entered into a guaranty agreement because he and the FHLBB failed to agree on the material terms of such a contract.

■ Mr. Frates has offered this Court no authority which holds that the representations made to State and Equivest by either the staff at the Topeka FHLB or the staff at the FHLBB's Office of General Counsel could in any way bind the FHLBB. Nothing in the statutes or regulations characterize the FHLBB as a figure head that simply ratifies an agreement reached between staff and an applicant. Rather, the FHLBB is to make an independent evaluation of the record as a whole and decide for itself whether or not to approve an application. When the FHLBB approves an acquisition application, the FHLBB is authorized to "unilaterally" impose any condition it feels is warranted by the facts, even a condition which had never been raised by the parties or discussed with FHLBB staff. Absent some express delegation of authority, the staff's role is limited to processing an application, gathering any additional information needed to make a decision on the application, offering advice to applicants, and making a recommendation to the FHLBB. *See, e.g.,* 12 C.F.R. §§ 500.17, 501.10 and 501.11 (1986). *See also* 12 C.F.R. § 563b.20(b) (1986) (indicating that the authority to authorize a voluntary, supervisory conversion is within the sole discretion of the FHLBB).[13]

---

**13.** Mr. Huffman, one of the individuals negotiating with the FHLBB during Equivest's ac-

The FHLBB's approval of the conversion and acquisition applications did not automatically obligate Equivest and State to close the Acquisition Agreement, which required a swap of State's stock for Equivest's real property. Rather, the FHLBB's approval of the applications simply permitted Equivest and State to close the Acquisition Agreement if they so chose. *See Equivest Financial Corp. v. FHLBB*, Nos. 89–5190 and 89–9560, 1992 WL 14550, at *2 (10th Cir. Jan. 27, 1992) (Seth, J., dissenting). Equivest was not required to fulfill its obligations under the Acquisition Agreement if the FHLBB approved the applications on terms materially different from the terms contained in the applications. *See* Doc. No. 179, Bates # 4967–5007. If the FHLBB approved the applications on materially different terms, Equivest and State were permitted to walk away and refuse to close the Acquisition Agreement between themselves. Equivest and State did not walk away. Instead, they closed the Acquisition Agreement.[14]

Equivest claims that it was misled into closing the Acquisition Agreement with State because the FHLBB's Office of General Counsel led Equivest and State to believe that the FHLBB had, or was going to, approve the applications without material modification of the terms contained in the applications. Equivest and State also allege that shortly after closing the Acqui-

sition Agreement, they learned that they had been misled and that the FHLBB's approvals did in fact materially modify the terms contained in the applications. Equivest alleges that it was further misled by post-closing statements from FHLBB staff that the FHLBB's resolutions would be corrected.

Equivest tried to get the FHLBB to voluntarily modify the conditions it imposed on approval of the conversion and acquisition applications. Equivest also filed a lawsuit in this Court and in the Tenth Circuit seeking a declaratory judgment that no contract existed between Equivest and the FHLBB or between Equivest and State. Equivest also sought to rescind/void the closing of the Acquisition Agreement by returning all parties to their respective positions as of December 30, 1986. The action in this Court was dismissed for lack of subject matter jurisdiction and the action in the Tenth Circuit was dismissed as untimely. *Equivest Financial Corp. v. FHLBB*, Nos. 89–5190 and 89–9560, 1992 WL 14550 (10th Cir. Jan. 27, 1992).

Equivest was unable to get the FHLBB to modify its resolutions to Equivest's satisfaction and Equivest was unable to get this Court or the Tenth Circuit to rescind/void the closing of the Acquisition Agreement. Equivest did close the Acquisition Agreement and Equivest did acquire

quisition of State, has testified that he understood that the Topeka FHLB could only make recommendations, but could not guarantee or control what requirements the FHLBB ultimately imposed. Doc. No. 371, Huffman Deposition, p. 19, ln. 22 to p. 20, ln. 7 and p. 454, ln. 14–19.

**14.** The FDIC argues that the terms of the FHLBB's resolutions became terms of, or were incorporated into, the Acquisition Agreement once Equivest and State closed the Acquisition Agreement between themselves. In particular, the FDIC argues that the portion of the FHLBB's resolutions requiring Mr. Frates to personally guarantee Equivest's obligation to contribute additional capital is now a term of the Acquisition Agreement and that the FDIC, as State's successor, is entitled

to enforce that term through an action for breach of the Acquisition Agreement. While the FDIC advances an interesting argument, the FDIC fails to recognize that while State was a party to the Acquisition Agreement, Mr. Frates was not. The undersigned fails to understand how, and the FDIC has not explained how, the Court can hold Mr. Frates liable for breach of a contract to which he is not a party. The FDIC's citation to *United States v. Winstar Corporation*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) is also not helpful. The agreement at issue in *Winstar* specifically incorporated by reference the applicable resolutions and the party against whom the contract was to be enforced (i.e., the FHLBB) was a party to the contract (i.e., a Supervisory Action Agreement).

control of and operate State. Having done so, Equivest is required to comply with the conditions imposed by the FHLBB when the FHLBB approved Equivest's application to acquire control of State. *Equivest*, 1992 WL 14550, at \*2 (Seth, J., dissenting). Consequently, the undersigned finds that Equivest is bound by the conditions of approval established by the FHLBB in its Conversion, Acquisition, and Amending Resolutions.

One of the conditions imposed on Equivest by the FHLBB's resolutions was that the Contributed Property be reappraised and that Equivest contribute additional capital if the new appraisals showed a net value for the Contributed Property of less than $27.4 million. The FDIC argues that new appraisals have been done and that they show a net value for the Contributed Property of less than $27.4 million and that Equivest has failed to contribute additional capital. The FHLBB's resolutions also require Mr. Frates to guarantee Equivest's obligation to contribute additional capital. The question presented by this lawsuit is whether Mr. Fates is bound by the FHLBB's resolutions, and whether the FDIC can enforce the terms of those resolutions.

Mr. Frates was not a direct party to the Acquisition Agreement between Equivest and State and he was not a direct party to the applications filed with the FHLBB. Nevertheless, Mr. Frates was a very important player in the overall scheme of things. Equivest was a newly formed company without a track record in the thrift industry and Equivest was trying to acquire a thrift. Equivest's viability and Equivest's ability to keep State adequately capitalized was of paramount importance to the FHLBB. Mr. Frates helped capitalize Equivest by contributing his interest in the Contributed Property and $1,166,-000. As a result, Mr. Frates owned all of Equivest's voting stock. Mr. Frates was also to serve as the chairman of Equivest's board of directors. It was also contemplated that Mr. Frates himself would even-

tually take an active role at State and he eventually became State's CEO and chairman of State's board of directors. Mr. Frates described himself to the FHLBB as a recognized industrialist, businessman and financier, and at the time he had a healthy net worth. *See* Doc. No. 179, Bates # 7056-61. Given this background, it is completely understandable that the FHLBB would look to Mr. Frates to ensure that Equivest could meet its obligation to adequately capitalize State. Mr. Frates was aware that the FHLBB was looking to him to guarantee Equivest's obligation and as Mr. Frates admits, he stood ready to enter into a guaranty under certain conditions. Therefore, it certainly could have come as no surprise to Mr. Frates that the FHLBB approved Equivest's acquisition application on the condition that Mr. Frates personally guarantee Equivest's obligation to adequately capitalize State.

### 1. This Court Lacks Subject Matter Jurisdiction to Entertain Mr. Frates' Objections to the FHLBB's Resolutions.

 Mr. Frates objects to the terms of the guaranty that the FHLBB's resolutions ultimately imposed on him and the restrictions the FHLBB's resolutions imposed on Equivest's operation of State. That is, Mr. Frates objects to the FHLBB's resolutions. This Court does not, however, have subject matter jurisdiction to entertain an attack by Mr. Frates against the FHLBB's resolutions.

Any person aggrieved by a final action of the FHLBB or the FSLIC approving or disapproving an *acquisition application* may obtain review of the final action by filing a petition for review with a United States court of appeals. 12 U.S.C. § 1730a(k). Any person aggrieved by a final action of the FHLBB or the FSLIC approving or disapproving a *charter conversion application* may also obtain review of the final action by filing a petition for review with a United States court of ap-

peals. 12 U.S.C. §§ 1464(*l*)(4) and 1725(j)(2).

Following are the relevant provisions for *charter conversion applications:*

> *Any aggrieved person* may obtain review of a final action of the [FHLBB] or the [FSLIC] which approves, with or without conditions, or disapproves a plan of conversion from the mutual to the stock form, only by complying with the provisions of subsection (k) of section 408 of the National Housing Act [12 U.S.C. § 1730a(k) ] within the time limit and in the manner therein prescribed, which provisions shall apply in all respects as if the final action were an order the review of which is therein provided for, except that such time limit shall commence upon publication of notice of such final action in the Federal Register or upon the giving of such general notice of final action as is required by or approved under regulations of the [FSLIC], whichever is later.

12 U.S.C. § 1464(i)(4) (emphasis added).

> *Any aggrieved person* may obtain review of a final action of the [FHLBB] or the [FSLIC] which approves, with or without conditions, or disapproves a plan of conversion pursuant to this subsection only by complying with the provisions of subsection (k) of section 1730a of this title within the time limit and in the manner therein prescribed, which provisions shall apply in all respects as if the final action were an order the review of which is therein provided for, except that such time limit shall commence upon publication of notice of such final action in the Federal Register or upon the giving of such general notice of such final action as is required by or approved under regulations of the [FSLIC], whichever is later.

12 U.S.C. § 1725(j)(2) (emphasis added).

Section 1730a(k) is incorporated by reference into both § 1464(i)(4) and § 1725(j)(2), which provide for review of final actions by the FHLBB or the FSLIC on *conversion applications.* Section 1730a(k) is also the section directly applicable to final actions under § 1730a(e)(1)(B), which is the subsection under which the FSLIC or the FHLBB, as the FSLIC's administrative and supervisory head, takes final action on *acquisition applications.* Thus, § 1730a(k) provides the method through which an aggrieved person may obtain review of a final action by the FHLBB or the FSLIC on a conversion and/or an acquisition application.

Section 1730a(k) provides as follows:

> Any party aggrieved by an order of the [FSLIC] under this section may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, or in the United States Court of Appeals for the District of Columbia Circuit, within thirty days after the date of service of such order, a written petition praying that the order of the [FSLIC] be modified, terminated, or set aside. A copy of such petition shall be forthwith transmitted by the by the clerk of the court to the [FSLIC], and thereupon the [FSLIC] shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, *such court shall have jurisdiction, which upon the filing of the record shall be exclusive,* to affirm, modify, terminate, or set aside, in whole or in part, the order of the [FSLIC]. Review of such proceedings shall be had as provided for in chapter 7 of Title 5 [—the APA]. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari as provided in section 1254 of Title 28.

12 U.S.C. § 1730a(k) (emphasis added).

Mr. Frates is a person aggrieved by a final action of the FHLBB. *Black's* defines an aggrieved person/party as a person who has been denied a personal, pecuniary or property right or against whom a burden or obligation has been imposed.

*Black's Law Dictionary* 65 (6th ed.1990). The FHLBB's resolutions certainly attempt to impose a burden or obligation against Mr. Frates in the form of a personal guaranty. Mr. Frates seeks to "modify, terminate, or set aside, in whole or in part," those portions of the FHLBB's resolutions that impose a personal guaranty on him. Sections 1464(*l*)(4), 1725(j)(2) and 1730a(k) establish that the exclusive means for Mr. Frates to obtain the relief he seeks is by filing a petition for review with a United States court of appeals.[15] *See, e.g., Harr v. Prudential Federal Savings and Loan Association,* 557 F.2d 751 (10th Cir.1977); and *Equivest Financial Corp. v. FHLBB,* Nos. 89–5190 and 89–9560, 1992 WL 14550 (10th Cir. Jan.27, 1992).

Equivest and State both sued the FHLBB in 1989. *See Equivest Financial Corp. v. FHLBB,* No. 89–CV–409–C (N.D.Okla. May 15, 1989). Both this Court and the Tenth Circuit found that Equivest's and State's arguments, no matter how articulated, were collateral attacks on the FHLBB's resolutions. As such, the only recourse available to Equivest and State was to file an appeal with a United States court of appeals. *See Equivest Financial Corp. v. FHLBB,* No. 89–CV–409–C (N.D.Okla. May 15, 1989); and *Equivest,* 1992 WL 14550 at *1. The arguments advanced by Mr. Frates in this case are not materially different from those advanced by Equivest and State in 1989. If this Court were to grant the relief Mr. Frates seeks, the Court would necessarily nullify the FHLBB's resolutions. As the Tenth Circuit held in *Equivest,* "this type of request can only be brought in the appropriate United States Court of Appeals." *Equivest,* 1992 WL 14550, at *1. The undersigned finds himself bound by this Court's prior ruling and by the Tenth Circuit's holding in *Equivest.*

In *Harr,* Prudential Federal Savings and Loan Association ("Prudential") was a mutual savings and loan association. Prudential filed an application to convert from a mutual association to a stock association and the FHLBB passed a resolution approving the conversion application. Prudential's depositors then sued Prudential in federal district court, arguing that the conversion was part of a conspiracy by Prudential's directors to benefit themselves and Prudential's officers, that the conversion plan was unfair and misleading, that the proxy materials prepared to offer Prudential's stock for sale were so deceptive that they violated Rule 10b–5 of the Securities and Exchange Commission, and that certain FHLBB regulations had been ignored during the conversion application process. The district judge dismissed the case for lack of subject matter jurisdiction. The Tenth Circuit affirmed, holding that for a court to grant the depositors the relief they sought (damages and an injunction) the FHLBB's approval of the conversion would first have to be set aside. The depositor's claims were, therefore, attacks on the FHLBB's resolution approving the conversion and the depositors' only recourse was to file a petition for review with a United States court of appeals pursuant to 12 U.S.C. § 1730a(k). Citing *Whitney National Bank in Jefferson Parish v. Bank of New Orleans,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), the Tenth Circuit concluded by holding that "[w]hen Congress has prescribed a particular method of review, that procedure is exclusive." *Harr,* 557 F.2d at 754.

Mr. Frates' position is not materially different from the depositors in *Harr.* For this Court to grant the relief Mr. Frates seeks, the FHLBB's resolutions would first have to be set aside or ignored at least in part. Congress has determined

---

**15.** Section 1730a(k) requires that a petition for review be filed with a United States court of appeals within 30 days. The last FHLBB resolution at issue in this case was passed on April 4, 1989. To date, Mr. Frates has not filed a petition for review with any United States court of appeals. Thus, any attempt by Mr. Frates to do so at this late date would in all likelihood be untimely.

that claims[16] which in any way result in the modification or termination of a final FHLBB resolution must be brought in a United State court of appeals. "By specifying that appeals under section 1730a(K) were to be filed in the Courts of Appeals, Congress expected to prevent conflicting rulings and duplicative proceedings that inevitably would result from permitting collateral attack of [FHLBB] orders in the various district courts...." *Harr,* 557 F.2d at 754 (citing *Fort Worth National Corp. v. FSLIC,* 469 F.2d 47 (5th Cir.1972)). While the result might be harsh in certain cases, it is a result Congress has mandated and the fact remains that Mr. Frates could have filed, but chose not to, a protective appeal with the Tenth Circuit. This Court lacks subject matter jurisdiction to entertain Mr. Frates' attacks on the FHLBB's resolutions and absent an order from a court of appeals modifying, terminating or setting aside the FHLBB's resolutions, Mr. Frates is bound by the FHLBB's resolutions.

In *Equivest,* the Tenth Circuit held that this Court lacked subject matter jurisdiction over Equivest's claims because the claims were in fact collateral attacks on the FHLBB's resolutions. The parties have spilt a great deal of ink arguing about whether the Tenth Circuit's decision in *Equivest* is preclusive of the issues raised by Mr. Frates. The FDIC argues that the *Equivest* decision is entitled to preclusive effect because Mr. Frates was in privity with Equivest when Equivest filed suit and because Equivest's and Mr. Frates' interests were identical. Mr. Frates argues that he was never in privity with Equivest and that his and Equivest's interests were in fact diverse. The Court need not re-

solve this issue. Either Mr. Frates was in privity with Equivest and he is bound by the Tenth Circuit's decision that this Court lacks subject matter jurisdiction, or Mr. Frates was not in privity with Equivest and the same rule applied by the Tenth Circuit in *Equivest* applies in this case. Sections 1464(*l*)(4), 1725(j)(2) and 1730a(k) of Title 12 of the United States Code prevent this Court from exercising subject matter jurisdiction over the types of attacks Mr. Frates seeks to lodge against the FHLBB's resolutions.

## D. THE FDIC MAY ENFORCE THE FHLBB'S RESOLUTIONS

### 1. The Undersigned's Prior Order—Focusing the Dispute

■ The FDIC has argued that the guaranty obligation imposed on Mr. Frates by the Acquisition Resolution is enforceable as a contract. Mr. Frates has vehemently disagreed, arguing that no meeting of the minds ever occurred between himself and the FHLBB. After reviewing the briefs, the undersigned determined that a contract analysis was not appropriate for this case. The undersigned informed the parties that this Report and Recommendation would analyze Mr. Frates' obligations as emanating from an administrative order, not a contract with the FHLBB.

According to Mr. Frates, the undersigned's decision not to treat the FHLBB's resolutions as contracts should end the matter and summary judgment should be granted in his favor because he has established that there is no contract, as alleged by the FDIC. In other words, Mr. Frates argues that the Court should ignore the fact that the obligations in the Acquisition

---

**16.** Mr. Frates is a defendant and he is asserting defenses to his liability in this case. Mr. Frates argues that the Tenth Circuit's holding in *Harr* does not apply to his defenses because *Harr's* holding is only applicable to claims seeking affirmative relief brought by a plaintiff. The undersigned finds nothing in *Harr* which would support limiting *Harr's* holding in the manner suggested by Mr. Frates. The Court in *Harr* was interpreting 12 U.S.C.

§ 1730a(k), and § 1730a(k) prohibits a district court from entertaining jurisdiction over any claim that would result in the modification, termination, or vacation, in whole or in part, of the FHLBB's resolutions. As discussed above, no matter how Mr. Frates' arguments are couched, they are at bottom attempts to modify, terminate, or set aside, in whole or in part, the FHLBB's resolutions.

Resolution are enforceable as an administrative order because the FDIC's First Claim for Relief is titled "Breach of Contract" and not "Failure to Comply With an Administrative Order." However, Mr. Frates himself ignores the fact that the FDIC's First Claim for Relief has always been bottomed on the allegation that condition 7 of the Acquisition Resolution imposes an obligation on Mr. Frates to contribute additional capital to State because the Contributed Property was reappraised at less than $27.4 million. The Federal Rules of Civil Procedure also do not require a pleader to plead a specific legal theory. Fed.R.Civ.P. 8; *Blazer v. Black*, 196 F.2d 139, 144 (10th Cir.1952). Rather Rule 8(a) only requires that a pleader set forth facts which entitle him to relief under any legal theory. *See also* Fed. R.Civ.P. 8(f) (requiring the Court to construe the FDIC's Third Amended Complaint so "as to do substantial justice"). The undersigned finds, therefore, that the consideration of a legal theory not advanced by either party does not present "pleading" problems under the Federal Rules of Civil Procedure.

The Tenth Circuit has also reasoned that courts should decide cases on the merits using the correct legal principles as determined by the court regardless of the previous positions taken by the parties. Any public policy against allowing parties to advance new or inconsistent legal positions, as opposed to factual positions, can be vindicated through avenues that do not discourage the determination of cases on their merits (e.g., sanctions). *See United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir.1986); *Osborn v. Durant Bank & Trust Co.*, 24 F.3d 1199 (10th Cir.1994); and *RTC v. Gregor*, 872 F.Supp. 1140, 1153 (E.D.N.Y.1994).

Finding that a contract analysis was not appropriate in this case, the undersigned ordered the parties to brief the following issues: (1) Does the FDIC have standing to enforce the FHLBB's resolutions as administrative orders; and (2) What is the statute of limitations, if any, applicable to such an enforcement action. *See* Doc. No. 382. Unlike the "shift" in *Evans v. McDonald's Corp.*, 936 F.2d 1087 (10th Cir. 1991), this "shift" in legal theories will not require any additional discovery and there is no trial date set for this case. Thus, Mr. Frates will not be prejudiced in maintaining his defense on the merits.

## 2. The FHLBB's Resolutions are Administrative Orders, Not Contracts

Mr. Frates' obligation to guarantee the value of the Contributed Property emanates from, and is contained in, a resolution duly passed and adopted by the FHLBB. The FHLBB's resolutions are in fact administrative orders. *See, e.g.*, 5 U.S.C. §§ 551(6), 551(7) and 701(b)(2). Administrative orders are to be complied with not because there is any meeting of the minds between the agency and the party to be bound, but because Congress has delegated certain authority to the agency and the agency's actions have the force of law. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 372–75, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (approving of Congress' broad delegation of authority even when another branch of the government is involved). For example, someone might file an application with the Environmental Protection Agency ("EPA") for permission to operate a waste water treatment plant. If the EPA approves the application with certain effluent restrictions, the party operating the plant is required to comply with the effluent restriction in the EPA's order, not because the party operating the plant and the EPA reached a meeting of the minds, but because the EPA's order has the force of law as a delegation of authority from Congress. In this case, Mr. Frates is required to comply with the FHLBB's resolutions not because he reached a meeting of the minds with the members of the FHLBB, but rather because Congress has delegated to the FHLBB the power to regulate and ensure the financial integrity of the nation's thrift

industry. As a direct exercise of that authority, the FHLBB entered an administrative order requiring Mr. Frates to give a personal guaranty to the FSLIC. The FHLBB's order has the force of law as surely as if it had been enacted directly by Congress. *See, e.g., RTC v. Tetco, Inc.,* 758 F.Supp. 1159, 1162 (W.D.Tex.1990) [17] and *State of Minnesota v. Bergeron,* 290 Minn. 351, 187 N.W.2d 680 (1971) (both recognizing that traditional contract principles do not apply in the administrative/regulatory context).

Properly characterized, what the FDIC seeks to do in its First Claim for Relief is enforce an administrative order, not a contract, issued by the FHLBB. With the FDIC's First Claim for Relief in proper perspective, the standing and statute of limitations issues in this case come into focus. Does the FDIC have standing to seek enforcement of an administrative order issued by the FHLBB? If the FDIC has standing to seek enforcement of the FHLBB's administrative orders, is such an enforcement action barred by the statute of limitations?

The FDIC is present in this lawsuit in two separate capacities. FIRREA transferred the assets and liabilities of the FSLIC to the FSLIC Resolution Fund and appointed the FDIC as manager of the fund. Thus, the FDIC has succeeded to all of the FSLIC's rights and obligations. *See RTC v. FSLIC,* 25 F.3d 1493 (10th Cir.1994). The FDIC is, therefore, standing before the Court in the FSLIC's shoes. The FDIC is also here as State's receiver.[18] Pursuant to 12 U.S.C. § 1821(d)(2)(A)(*l*),[19] the FDIC steps into the shoes of a failed, federally insured depository institution and thereby obtains those rights of the institution which existed prior to receivership. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). Thus, as State's receiver, the FDIC has succeeded to all claims held by State. The FDIC is, therefore, also standing before the Court in State's shoes. May the FDIC, as either the FSLIC or State, enforce the FHLBB's administrative orders?

### 3. Enforcement of the FHLBB's Administrative Orders by the FDIC as the FSLIC

#### a. *The FSLIC's Right to Enforce the Resolutions*

Mr. Frates' obligation to guarantee Equivest's obligation to contribute additional capital to State is imposed by Condition 7 of the FHLBB's Acquisition Resolution. Doc. No. 179, Bates # 7068–7071. The Acquisition Resolution approved Equivest's application to acquire control of State. Pursuant to the NHA, applications to acquire control of FSLIC-insured savings and loan associations are to be made

17. The parties settled this case on appeal and the Fifth Circuit applied the Supreme Court's *Munsingwear* doctrine to vacate the district court's order. *See RTC v. Tetco, Inc.,* No. 91–5612, 1992 WL 437650, at *1 (5th Cir. Apr. 7, 1991) (applying *United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950)). Therefore, the district court's order no longer has any legal effect. The district court's opinion is, nevertheless, persuasive.

18. FIRREA authorized the FDIC to act as receiver or conservator for any insured depository institution. FIRREA also established the RTC under the FDIC's control to assist the FDIC in dealing with savings and loan associations like State, that were previously insured by the FSLIC and were declared insolvent between January 1, 1989 and August 9, 1992. The RTC was initially appointed as State's receiver. Pursuant to the Resolution Trust Corporation Completion Act, the RTC ceased to exist on December 31, 1995. As of January 1, 1996, all of the RTC's assets, including State's assets, were transferred to the FDIC. *See, RTC v. FDIC,* 25 F.3d 1493 (10th Cir. 1994).

19. Section 1821(d)(2)(A)(*l*) provides as follows:

The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to all rights, titles, powers, and privileges of the insured depository institution, and any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.

to the FSLIC. 12 U.S.C. §§ 1730(q) & 1730a(e)(1)(B). Equivest's application was made to the FSLIC.

■ The FHLBB is the administrative and supervisory head of the FSLIC and the FSLIC operated under the direction of and according to the bylaws, rules and regulations established by the FHLBB. *See* 12 U.S.C. §§ 1437(b), 1725(a), 1725(c), and 1730(k)(1). *See also* 12 C.F.R. § 500.4 (1986). When the FHLBB approved Equivest's acquisition application, the FHLBB stated in the third "whereas" clause of the Acquisition Resolution that it was approving the application as the "operating head of the FSLIC." The FHLBB was operating on behalf of the FSLIC (i.e., as the FSLIC's agent) when its passed the Acquisition Resolution and imposed a guaranty obligation on Mr. Frates. The undersigned finds, therefore, that the FSLIC has the right to enforce Condition 7 of FHLBB's Acquisition (i.e., Resolution 86–1296) as if it were the FSLIC's own resolution.

### b. *Statute of Limitations*

■ The parties have not identified a specific federal statute of limitations which would govern an action by the FDIC, as the FSLIC, to enforce an administrative order issued by the FSLIC or the FHLBB.[20] To determine if a time bar should be applied against an agency of the United States in the absence of a clearly applicable federal statute of limitations, the Court must first determine what type of claim is being advanced. If the claim being advanced is a government enforcement action or an action enforcing sovereign/public rights (i.e., an action brought by the United States in its governmental capacity), it is well settled that in the absence of a clear and unambiguously expressed congressional time bar, the action is not subject to any time limitation. If the claim being advanced is an action to enforce the rights of private persons, then the Court should borrow the most analogous statute of limitations from the forum state, provided that application of the state's limitations period would not be inconsistent with a significant federal policy. However, any statute of limitation which is ultimately applied to the United States must be strictly construed in favor of the United States and its agencies.[21]

The Court need not determine whether this action is a government enforcement action or a an action enforcing the rights of a private party because the FDIC's First Claim for Relief would be timely under either theory. If this action to enforce an administrative order is viewed as a government enforcement action, then no statute of limitations would be applicable and the FDIC's First Claim for Relief would be timely. If this action is viewed as an action to enforce the rights of a private party (i.e., State's), then the most analogous Oklahoma statute of limitations would be applied and the FDIC's First Claim for Relief would be timely under Oklahoma law.

---

**20.** FIRREA's statute of limitations does not apply because it only applies to actions brought by the FDIC in its capacity as a conservator or receiver of a failed depository institution. 12 U.S.C. § 1821(d)(14). Here, the FDIC is seeking to enforce an administrative order issued by the FHLBB. The FDIC is not asserting a claim held by the FDIC as State's receiver. Also, the general statute of limitations at 28 U.S.C. § 2415 is not applicable. Section 2415 provides limitations periods for tort and contract claims brought by the United States. Again, this is an action to enforce an administrative order, not an action founded on a contract or a tort.

**21.** *See County of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226, 240–41, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Occidental Life Ins. Co. of California v. EEOC*, 432 U.S. 355, 366–67, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977); *United States v. Telluride Company*, 146 F.3d 1241, 1244–45 (10th Cir. 1998); *United States v. Jac Natori Co., Ltd.*, 108 F.3d 295, 298 (Fed.Cir.1997); *Marshall v. Intermountain Electric Company, Inc.*, 614 F.2d 260, 261–62 (10th Cir.1980); *Harp v. United States*, 173 F.2d 761, 764–64 (10th Cir.1949); and *Mullikin v. United States*, 952 F.2d 920 (6th Cir.1991).

■ Oklahoma's statute of limitations is set out at 12 Okla. Stat. § 95. The only relevant limitations are in § 95(2) and § 95(10). Section 95(2) sets a three year limit for "an action upon a liability created by statute other than a forfeiture or penalty...." Section 95(10) is a catchall provision and it sets a five year limit for "[a]n action for relief, not hereinbefore provided for...." Both time periods run from the date the cause of action shall be determined to have accrued. The liability sought to be enforced in this case was created by an administrative order, not a statute *per se*. The time limit set out in § 95(2) is, therefore, not directly applicable. In light of the fact that statutes of limitation must be construed strictly in favor of the United State, the undersigned would not apply § 95(2) to this case and would apply the five year limit in § 95(10).

■ The decision to apply § 95(10) in this case is further supported by the fact that a statute of limitations defense is generally disfavored by the courts. Therefore, any doubts as to which of two statutes is applicable in a given case should be resolved in favor of applying the statute containing the longer limitations period. *See Williams v. Lee Way Motor Freight, Inc.,* 688 P.2d 1294 (Okla.1984); *Hughes v. Reed,* 46 F.2d 435, 440 (10th Cir.1931); and *Lee Houston & Assoc., Ltd. v. Racine,* 806 P.2d 848, 854–55 (Alaska 1991).

If Equivest failed to contribute additional capital to State, the FHLBB's resolutions required Mr. Frates to satisfy Equivest's obligations by contributing additional capital to State himself. Mr. Frates was required to perform on his guaranty within 30 days after State was required to record in its books reductions in the value of the Contributed Property. Doc. No. 179, Bates # 7070, ¶ 7. New appraisals of the Contributed Property were completed, and the FHLBB ordered State to record in its books reductions to the Contributed Property by June 3, 1989. Doc. No. 358, Exhibit 16. The record suggests that, despite the FHLBB's di-

rective, State never in fact reduced the value of the Contributed Property shown on its books. Doc. No. 179, Bates # 3656–3728 and 5945–48. At a minimum, Mr. Frates would have been required to make his contribution by July 3, 1989 (i.e., within 30 days of the FHLBB ordering State to reduce the value of the Contributed Property). This lawsuit was filed on February 12, 1993, approximately 3½ years after Mr. Frates was required to contribute additional capital. Thus, even if Oklahoma's statute of limitations were borrowed, the FDIC's action would be timely under § 95(10)'s five year limitation.

**4. Enforcement of the FHLBB's Administrative Orders by the FDIC as State**

As State's receiver, the FDIC may assert any claim available to State. Neither the Federal Home Loan Bank Act of 1932, The Home Owners' Loan Act of 1933 nor The National Housing Act of 1934 expressly provide a savings and loan association with a right to sue for violations of FHLBB resolutions. The question is, therefore, whether this Court should imply a private cause of action under either the FHLBA, HOLA or the NHA on behalf of a federally-chartered, federally-insured savings and loan association to seek enforcement of FHLBB resolutions which require a third party to guarantee the obligation of the savings and loan association's holding company to contribute capital to the savings and loan association. *See, e.g., City Federal Sav. and Loan Assoc. v. Crowley,* 393 F.Supp. 644, 652–54 (E.D.Wis.1975); *Mortensen v. First Fed. Sav., and Loan Assoc.,* 79 F.R.D. 603, 611–17 (D.N.J.1978); and *King v. Edwards,* 559 F.Supp. 75, 82–85 (N.D.Ga.1982).

■ To determine if a private cause of action is implicit in a statute not expressly providing one, the central inquiry is whether Congress intended to create a private cause of action. The Supreme Court has effectively abandoned the rigid

four-part test outlined in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort's* four factors have been condensed into one—whether Congress intended to create a private cause of action. The factors identified in *Cort* are used only to help determine legislative intent.[22] Because, the undersigned finds that the FDIC may enforce the FHLBB's resolutions as the FSLIC, the undersigned need not decide whether the FDIC can also enforce the FHLBB's resolutions as State through a private cause of action. The undersigned will, therefore, not decide whether a private right of action on behalf of State can be implied from the FHLBA, HOLA or the NHA.

### E. UNDER THE FHLBB'S RESOLUTIONS, MR. FRATES' OBLIGATION TO CONTRIBUTE ADDITIONAL CAPITAL TO STATE HAS NOT BEEN TRIGGERED.

Mr. Frates' obligation to contribute additional capital to State is expressed in the following language from the FHLBB's Acquisition Resolution:

> Within thirty days of [Equivest's acquisition of State], Equivest and J.A. Frates, personally, shall stipulate to the [FSLIC] that, if the appraisal required in [Condition 6 of the Conversion Resolution], values the contributed real estate at less than a valuation of $27.4 million net, then Equivest will cause to be contributed to State assets ... equal to or greater than the difference between the new appraisal value and $27.4 million net; [Equivest's obligation to contribute additional capital to State] shall be guaranteed personally by Mr. Frates to the extent needed to bring State's regulatory capital to at least 5% of liabilities; and that Equivest and Mr.

Frates shall cause the required asset contributions to be made within 30 days of [State] recording any reductions in the value of the contributed properties[.]

*See* FHLBB Resolution 86–1296, Doc. No. 179, Bates # 7068–7071.[23] The Conversion Resolution required that "[a]n appraisal comporting with Memorandum R41c, shall be made of all properties ... within a period of six months, unless extended for up to three months by the PSA for good cause shown." The Amending Resolution amended the Conversion Resolution and substituted the appraisal standard attached to the Amending Resolution for Memorandum R–41c.

Mr. Frates argues that the language in the Conversion and Acquisition Resolutions imposes the following three conditions on his obligation to contribute additional capital to State:

1. State's regulatory capital must be less than 5% of State's total liabilities as of December 30, 1986—the date Equivest acquired State;

2. New appraisals of the Contributed Property must be obtained within nine months from December 30, 1986—the date Equivest acquired State; and

3. The new appraisals must comport with Memorandum R–41b or R–41c.

Mr. Frates argues that his obligation to contribute additional capital to State was never triggered because none of these conditions was ever met.

#### 1. The 5% Limit on Mr. Frates' Personal Guaranty

Mr. Frates and the FDIC agree that Mr. Frates was obligated to contribute additional capital to State only to the ex-

---

**22.** *See Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15–16 & 23, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Thompson v. Thompson*, 484 U.S. 174, 189, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring); *Schmeling v. NORDAM*, 97 F.3d 1336, 1343–44 (10th Cir.1996); and *Sonnen-*

*feld v. City and County of Denver*, 100 F.3d 744, 747 (10th Cir.1996).

**23.** The undersigned has added the language contained within the braces for clarification only. Nothing within the braces changes the meaning of the language used by the FHLBB.

tent needed to bring State's regulatory capital to at least 5% of total liabilities. For example, if State's total liabilities were $1,000,000.00 and if State's regulatory capital was $50,000.00, Mr. Frates would not be required to contribute any additional capital because no additional capital would be needed to bring State's regulatory capital up to at least 5% of total liabilities. What the parties do not agree on is the timing of the 5% calculation.

■ The FHLBB's resolutions do not define when State's regulatory capital and total liabilities should be measured to determine if an additional contribution is needed. Mr. Frates argues that State's regulatory capital and total liabilities as of December 30, 1986 (i.e., the date Equivest acquired State) should be used to make the 5% calculation. The FDIC argues that State's regulatory capital and total liabilities as of sometime in mid–1989 (the date Mr. Frates was required to perform his obligation under the FHLBB's resolutions, which was to be 30 days after State was required to adjust the value of the Contributed Property in its books) should be used to make the 5% calculation. The undersigned agrees with Mr. Frates.

Equivest and State agreed that as consideration for Equivest's acquisition of 100% of State's stock, Equivest would convey to State certain parcels of real property worth at least $27.4 million. Equivest then applied for permission to acquire State, which the FHLBB granted with certain conditions. One of those conditions was essentially that Equivest prove that the Contributed Property was in fact worth $27.4 million, and if the property was not worth $27.4 million that Equivest make up any difference between $27.4 million and the value assigned to the Contributed Property by new appraisals. To ensure that State would in fact receive additional capital to account for any shortfall in the value of the Contributed Property, the FHLBB required Mr. Frates, as owner of all of Equivest's common stock and as Equivest's president and chief ex-

ecutive officer, to personally guarantee Equivest's obligation to contribute additional capital to State. While Equivest was on the hook for the entire shortfall between $27.4 million and the new appraisals, the FHLBB limited Mr. Frates' personal liability to an amount needed to ensure State's minimum fiscal integrity (i.e., the amount needed to bring State's regulatory capital to 5% of total liabilities).

The purpose behind the FHLBB requiring new appraisals of the Contributed Property, requiring Equivest to contribute additional capital, and requiring Mr. Frates to personally guarantee Equivest's obligation, was to protect State's fiscal health by ensuring that State was in fact receiving property worth at least $27.4 million. The FHLBB's focus was on the value of the Contributed Property as of the date State took title to the property. That this was the FHLBB's focus is confirmed by the fact that all parties agree, even though the Contributed Property was to be reappraised many months after State acquired title to the Contributed Property, the Contributed Property was to be reappraised as of December 30, 1986, the date Equivest and State closed the Acquisition Agreement and State obtained title to the Contributed Property. Thus, the FHLBB's goal was to ensure that on the date State obtained title to the Contributed Property from Equivest, the Contributed Property was worth $27.4 million. If it was not, Equivest, whose obligation was personally guaranteed by Mr. Frates, was to contribute additional capital.

The undersigned finds that regarding the Contributed Property the FHLBB's focus was on ensuring that State had sufficient capital as of the date Equivest acquired State. The new appraisals were geared to the date Equivest acquired State and Equivest's obligation to contribute additional capital was geared to a value (i.e., $27.4 million) established as of the date Equivest acquired State. It is, therefore, consistent to conclude that the 5% limit on

Mr. Frates' personal guaranty of Equivest's obligation was also geared to the date of acquisition. The undersigned finds that with Mr. Frates' personal guaranty the FHLBB was simply trying to ensure that State's regulatory capital at the time of Equivest's acquisition would be at the minimum needed for fiscal health (i.e., 5% of total liabilities).

The FDIC offers several arguments in support of its claim that the 5% limit on Mr. Frates' personal guaranty must be measured at some point other than December 30, 1986, the date Equivest acquired State. The FDIC's arguments can be grouped into two categories: those apparently based on Mr. Frates' subjective intent, and those based on the language of the FHLBB's resolutions.

### a. *FDIC's Interpretive Arguments Based on Mr. Frates' Subjective Intent*

The FDIC advances the following three assertions of fact to suggest that at least Mr. Frates understood that the 5% limit on his personal guaranty was to be measured at some point other than the date Equivest acquired State: (1) During the application phase, Mr. Frates made a proposal in connection with his personal guaranty which would value the Contributed Property at a point in time five years after Equivest acquired State; (2) Prior to this lawsuit, Mr. Frates never raised the 5% limit as a bar to performance on his personal guaranty; and (3) Mr. Frates requested that his obligation to contribute additional capital to State be offset by gains received by State from the sale of the Contributed Property.

 Initially, the undersigned finds that Mr. Frates' subjective and/or objective intent is irrelevant. The Court's job in interpreting the FHLBB's resolutions is to ascertain the intent of the FHLBB, much like the Court's job is to ascertain the intent of Congress when it interprets a statute. *See United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971

F.2d 548, 552 (10th Cir.1992); and *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 454–55, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (describing a holistic approach to statutory construction, including reference to the object and purpose of the enactment at issue). As discussed above, within the context of Equivest's application for regulatory approval of its acquisition of State, there was no meeting of the minds between the FHLBB and either Equivest or Mr. Frates, and a meeting of the minds was not required for the FHLBB's administrative orders to have force and effect. The same is true with a statute passed by Congress. A statute is not enforceable because the mind of Congress and the mind of a party purportedly bound by the statute have met. When interpreting a statutory or regulatory enactment, the intent of the enacting body (i.e., Congress or the FHLBB), and not the intent of the party purportedly bound by the enactment, is the only relevant intent. Thus, Mr. Frates' subjective intent is irrelevant.

Throughout its argument, the FDIC accuses Mr. Frates of offering no evidence other than the speculation of counsel regarding the FHLBB's intent. The undersigned notes that the FDIC also has offered nothing from the FHLBB or its staff which would shed light on the FHLBB's intent at the time the resolutions were passed (i.e., something akin to legislative history). In fact, the FDIC admits that the 5% limit on Mr. Frates' personal guaranty was never discussed by Mr. Frates, State, Equivest or the FHLBB staff. According to the FDIC, the FHLBB unilaterally exercised its administrative largesse at the last minute and limited Mr. Frates' personal guaranty to 5% of State's total liabilities. *See, e.g.*, Doc. No. 371, Huffman Deposition, p. 67, ln. 17 to p. 69, ln. 14. Thus, the Court only has the language of the resolutions, the surrounding circumstances leading to the passage of each resolution, and the perceived object and purpose of the resolutions to help guide its

interpretation of the 5% limit in the FHLBB's resolutions.[24]

Even if Mr. Frates' subjective intent were relevant, the evidence offered by the FDIC does not support the inference the FDIC seeks to draw from that evidence— that even Mr. Frates thought the 5% calculation would be made using post-closing figures. First, the FDIC points to an October 1986 proposal by Mr. Frates. *See* Doc. No. 216, Exhibit 24. Mr. Frates proposed that on the fifth anniversary of State's conversion the remaining Contributed Property be reappraised. Mr. Frates proposed that the aggregate proceeds received from State from selling any of the Contributed Property during the five years and the aggregate reappraised value of the remaining Contributed Property be added together to confirm that the Contributed Property was worth $27.4 million on the date Equivest acquired State. The proceeds plus reappraised values together were to be known as the Confirmed Value. Equivest would be required to contribute additional capital only if the Confirmed Value was less than $27.4 million, and only if State's regulatory capital was below 6% of total liabilities.

The FDIC argues that Mr. Frates' proposal reflects an understanding, at least by Mr. Frates, that for purposes of the resolutions ultimately passed by the FHLBB, State's capital position was to be measured in the future and not as of the date Equivest acquired State. The FHLBB obvi-

ously rejected Mr. Frates' proposal and required the Contributed Property to be valued as of the date Equivest acquired State. The FHLBB also severely limited Mr. Frates' ability to use the proceeds State obtained from the sale of the Contributed Property. *See* Resolution 89–1307, p. 3.[25] If the FHLBB wanted to tie the 5% limit on Mr. Frates' personal guaranty to a future date, the FHLBB could have used language from Mr. Frates' proposal. The FHLBB's rejection of Mr. Frates' five year plan makes it reasonable to conclude that the FHLBB's focus was not on some future date, as argued by the FDIC, but on the date State was to acquire the Contributed Property.

After Mr. Frates' five-year proposal was rejected, Mr. Frates continued to argue that the obligation imposed by his personal guaranty should be offset by any proceeds State received from the sale of any of the Contributed Property. Again, the FDIC argues that this reflects an understanding on Mr. Frates' part that the 5% limit be calculated substantially after Equivest acquired State. Under Mr. Frates' second proposal, his obligation on the personal guaranty would be set by looking at State's capital position on the date Equivest acquired State and that obligation would be reduced by any proceeds actually received by State for sales of the Contributed Property prior to the time Mr. Frates was obligated to perform on his guaranty. Thus, allowing an offset to Mr. Frates'

24. The FDIC does offer the deposition testimony of Tommie D. Thompson, who was the Executive Vice President and Director of Supervision for the Topeka FHLB. Mr. Thompson agrees with the FDIC that the 5% limit in the Acquisition Resolution is to be measured at the time Mr. Frates is required to perform on his guaranty (i.e., sometime in 1989). Doc. No. 371, Thompson Deposition, p. 316, ln. 23 to p. 328, ln. 9. Other than the fact that Mr. Thompson was a senior manager at the Topeka FHLB, there is no foundation offered for Mr. Thompson's opinion. For instance, there is no testimony which indicates that Mr. Thompson has seen this type of language in other FHLBB resolutions or that he has been informed by the FHLBB that this type of

language should be interpreted in a particular way, or that the language is a term of art in the lending industry with a particular meaning. Mr. Thompson's opinion, offered more than 11 years after the Acquisition Resolution was passed, is not particularly helpful in determining what the intent of the members of the FHLBB was when they voted to pass the Acquisition Resolution.

25. In fact, Mr. Frates is prohibited from using any realized gains from State's sale of the Contributed Property because there is no evidence in the record that Mr. Frates has complied with the conditions set forth in the Amending Resolution.

personal guaranty for proceeds of sales of the Contributed Property is not inconsistent with an understanding that the 5% limit was to be measured initially as of the date Equivest acquired State.

The FDIC argues that until he responded to the FDIC's motion for summary judgment, Mr. Frates never mentioned the fact that he had no obligation on his personal guaranty because of the 5% limitation. The FDIC argues that if Mr. Frates "had understood that he had no liability on his guaranty because the new appraised values did not reduce State Federal's December 30, 1986 regulatory capital to below five percent of liabilities, he would have raised that issue long ago." Doc. No. 222, p. 28. The FDIC's waiver argument might be persuasive if Mr. Frates' intent mattered. The FDIC's argument is, however, of no help to the Court in attempting to discern the intent of the FHLBB when it set the 5% limit on Mr. Frates' personal guaranty.

### b. *FDIC's Interpretive Arguments Based on the Language of the FHLBB's Resolutions*

The FDIC argues that measuring the 5% limit on Mr. Frates' personal guaranty as of the date Equivest acquired State is inconsistent with the terms of the Conversion and Acquisition Resolutions. The FDIC argues that because State's total liabilities were known as of the date of the acquisition,[26] if the FHLBB wanted to limit Mr. Frates' guaranty to five percent of State's liabilities as of the time of the acquisition, it would not have expressed the limit as a percentage of liabilities. Rather, the FDIC argues, the FHLBB would simply have set a number equal to

five percent of liabilities, then approximately $16.2 million. *See* Doc. No. 222, p. 27. In other words, the FDIC argues that the fact that the FHLBB chose to express the limit on Mr. Frates' guaranty as a percentage of liabilities, rather than as a set number, demonstrates that the FHLBB was focused on some date other than the date of acquisition, when State's total liabilities would be unknown. From the undersigned's review of all of the documents in this record and after reviewing the regulations promulgated by the FHLBB, the undersigned finds that speaking in terms of percentages of a savings and loan's total liabilities, rather than in absolute numbers, appears to be part of the lexicon used by the FHLBB. It was, therefore, natural for the FHLBB to express the limit on Mr. Frates' personal guaranty in terms of a percentage of total liabilities rather than by using an absolute number. In any event, the undersigned finds that the FHLBB's use of a percentage rather than an integer is too subtle a distinction for this Court to draw any meaningful inferences regarding the FHLBB's true intent.

The FDIC notes that the Acquisition Resolution sets a specific time for Mr. Frates to pay on his personal guaranty—30 days from the date State records reductions in the value of the Contributed Property due to new appraisals. From this fact, the FDIC argues that if the FHLBB "had intended the five percent limit [on Mr. Frates' guaranty] to be measured at an earlier time, it would have said so." Doc. No. 222, p. 27. If the FHLBB had intended the five percent limit on Mr.

---

**26.** This is an assumption without any support in the record. The FDIC's argument is predicated on the assumption that when the FHLBB passed its 1986 resolutions the FHLBB knew what State's total liabilities would be on the date Equivest actually acquired State. Although it would have been reasonable for the FHLBB to assume that Equivest and State would close the transaction prior to January 1, 1987 to take advantage of certain tax laws, there is no evidence that the FHLBB knew for sure when Equivest and State would actually close the Acquisition Agreement between themselves and when State would actually receive the Contributed Property. There is also no evidence that in December 1986, when the FHLBB passed its 1986 resolutions, that State's liability position was actually known. There is no evidence that State's books had been audited and closed for December and/or 1986.

Frates' guaranty to be measured at the time he was to pay, it could have said that as well. Obviously, the problem is that the FHLBB said neither. Payment necessarily was to be in the future because payment could not occur until after new appraisals had been obtained. Thus, no real inference about when the FHLBB intended the 5% limit to be measured can be drawn from the fact that the FHLBB set the payment date in the future.

The FDIC argues that measuring the 5% limit on Mr. Frates' personal guaranty as of the date Equivest acquired State is inconsistent with the terms of the FHLBB's Amending Resolution (i.e., Resolution 89–1307). The FDIC argues that if Mr. Frates is correct that the FHLBB intended for the 5% limit on his personal guaranty to be measured as of the date of the acquisition, then "the FHLBB would not have renewed its order that Defendant Frates enter into his guaranty in Resolution No. 89–1307 ... because doing so would have been meaningless." Doc. No. 222, p. 28. The undersigned does not agree. As the Amending Resolution states, except for the specific changes mentioned in the Resolution, the FHLBB specifically did not intend to change the nature of any of the rights or obligations under the Conversion or Acquisition Resolutions. In connection with Mr. Frates' guaranty, the focus of the Amending Resolution is primarily on resolving the issue of what standards to use to reappraise the Contributed Property. In this regard, all the FHLBB did in the Amending Resolution was slightly amend a paragraph in the Conversion Resolution to reflect that the appraisal standards attached to the Amending Resolution were to be used to reappraise the Contributed Property.[27] The paragraph in the Acquisition Resolution which actually contains Mr. Frates' personal guaranty, and the 5% limit on that guaranty, were not amended or even addressed by the FHLBB in the Amend-

ing Resolution. Also, the Amending Resolution makes no specific demand on Mr. Frates to pay under his personal guaranty, as intimated by the FDIC.

If the Court were to accept the FDIC's argument that the FHLBB intended the 5% limit on Mr. Frates' personal guaranty to be measured at some date significantly in the future, rather than as of the date Equivest acquired State, then the Court would in effect be finding that the FHLBB intended to make Mr. Frates a guarantor of the future performance of State, the economy in general and the thrift industry in particular. Because the 5% limit on Mr. Frates' personal guaranty is a function of State's total liabilities, the FDIC's argument would require Mr. Frates to not only be a guarantor of a portion of the value of the Contributed Property, Mr. Frates would also be guaranteeing the future profitability of State between the date of acquisition and 30 days from the date State reduced the value of the Contributed Property on its books. If market conditions were bad and if, as a result, State's total liabilities rose during this period, Mr. Frates' ultimate obligation under his personal guaranty would also rise until it was equal to the full difference between $27.4 million and the reappraised value of the Contributed Property. The undersigned finds that if the FHLBB intended to make Mr. Frates a guarantor of State's future profitability to any degree, the FHLBB was required to use more specific language than it did.

### c. Calculation of the 5% Limit On Mr. Frates' Personal Guaranty

For the reasons discussed above, the undersigned finds that the 5% limit on Mr. Frates' personal guaranty in ¶ 7 of the Acquisition Resolution (i.e., Resolution 86–1296) is to be calculated as of December 30, 1986, the date Equivest acquired State and conveyed property purportedly worth

---

**27.** As discussed above, the FHLBB also granted, with several conditions, Mr. Frates' request to let him offset the obligation under his personal guaranty with gains State actually received from any sales of the Contributed Property.

$27.4 million to State. There is no admissible evidence of record from which the Court can make the 5% calculation as of December 30, 1986.[28] However, the FDIC concedes that "after adjustment for the reappraised value of the Contributed Properties, State Federal's regulatory capital, based upon numbers known to the parties around the time of the acquisition, would be slightly more than 5 percent of State Federal's total liabilities." Doc. No. 384, FDIC's 5% Calculation Brief, p. 6. Based on this concession, the undersigned finds that Mr. Frates' obligation to contribute additional capital to State under the personal guaranty reflected in ¶ 7 of the Acquisition Resolution has not been triggered.

### 2. Timing of New Appraisals

The Acquisition Resolution states that Equivest has an obligation to contribute additional capital to State only "if the appraisal required [in Condition 6 of the Conversion Resolution] values the contributed real estate at less than a valuation of $27.4 million net." Condition 6 of the Conversion Resolution provides as follows:

> An appraisal ... shall be made of all properties ('new appraisal') within a period of six months, unless extended for up to three months by the [Principal Supervisory Agent] for good cause shown.

Doc. No. 179, Bates # 7068–7071. Mr. Frates argues that these portions of the FHLBB's resolutions condition Equivest's obligation to contribute additional capital to State, and consequently his personal guaranty, on State's Principal Supervisory Agent obtaining new appraisals of the Contributed Property within nine months of the date Equivest acquired State.

The undersigned does not find Mr. Frates' arguments on this issue persuasive. Nevertheless, the undersigned will not resolve this issue. The undersigned has already determined that because of the 5% limit on Mr. Frates' personal guaranty, his obligation to perform the guaranty has not been triggered. There is, therefore, no need to determine whether the failure to obtain new appraisals within nine months also prevents Mr. Frates' obligation from being triggered.

### F. Conclusion

The FHLBB resolutions at issue in this case are administrative orders, not contracts between Mr. Frates, or any other party, and the FHLBB. Sections 1464(*l*)(4), 1725(j)(2), and 1730a(k) of Title 12 of the United States Code require any claim that would have the effect of modifying, terminating, or setting aside, in whole or in part, any portion of the FHLBB's resolutions to be brought before a United States court of appeals, and not this Court. Mr. Frates has not presented this Court with an order from any court of appeals modifying, terminating, or setting aside any part of the FHLBB's resolutions. The FDIC, as the FSLIC, has standing to enforce the FHLBB's administrative order against Mr. Frates and the FSLIC's claims are not time barred. Mr. Frates is, therefore, bound by the language in the FHLBB's resolutions.

The personal guaranty imposed on Mr. Frates by the FHLBB's resolutions requires Mr. Frates to contribute additional capital to State only to the extent necessary to raise State's regulatory capital to 5% of State's total liabilities as of December 30, 1986. As of December 30, 1986, State's regulatory capital exceeded 5% of total liabilities. Therefore, Mr. Frates' obligation under his personal guaranty was never triggered and he is not required to

---

28. The Sheshunoff Information Services, Inc. report submitted by Mr. Frates is, as the FDIC argues, hearsay, and Mr. Frates has offered nothing which would establish that it fits within any of the exceptions to hearsay in Fed.R.Evid. 803 or 804. *See* Doc. No. 216, Exhibit 26. If, however, the Sheshunoff report is used, it appears that as of December 30, 1986, State's regulatory capital was approximately 5.35% of total liabilities. *See* Doc. No. 384, FDIC's 5% Calculation Brief, p. 6.

contribute any additional capital to State. For these reasons, the undersigned recommends that summary judgment be granted for Mr. Frates on the First Claim for Relief in the FDIC's Third Amended Complaint.

## III. SECOND CLAIM FOR RELIEF— Mr. Frates' Breach Of An Oral Agreement to Indemnify State Against Loss in Connection With the Sierra Property and the Kaiser Litigation

The FDIC argues that Mr. Frates, directly and through his agents, made various representations to the FSLIC, the FHLBB and State's board of directors, which establish that Mr. Frates orally agreed to indemnify State from any loss State might suffer in connection with the Sierra property as a result of the Kaiser adversary proceeding. To evaluate the FDIC's Second Claim for Relief, it is necessary to summarize the evidence of record offered by the parties.

### A. Summary of the Evidence

As was discussed above in section I(C), the Frates Group acquired the Sierra property through a series of transactions from Kaiser. Mr. Frates was a member of the Frates Group, and as a tenant in common with the other members of the Frates Group, he acquired a 1.1844% share of the Sierra property. Mr. Frates, and the other members of the Frates Group, conveyed their interest in the Sierra property to Equivest on December 29, 1986 and Equivest conveyed the Sierra property to State on December 30, 1986. *See* Doc. No. 179, Bates # 5519–27 and Doc. No. 216, Exhibits 17, 32 and 33.[29] The deed executed by Mr. Frates and other members of the Frates Group was a standard "grant deed" with no explicit warranties on its face. Doc. No. 216, Exhibit 17.

Mr. Frates was served with a copy of the Complaint in the Kaiser adversary

proceeding on March 11, 1987, and a *lis pendens* was filed on the Sierra property shortly thereafter. Mr. Huffman has testified that shortly after Mr. Frates became aware of the Kaiser litigation, Mr. Naegler, Mr. Merrick, Mr. Huffman and, more likely than not, Mr. Frates made a conference call to Charles W. Petty, an attorney with a Washington, D.C. law firm acting as regulatory counsel for State and Equivest. According to Mr. Huffman, during this conference call Mr. Merrick told Mr. Petty that "they" would cover any loss State might suffer due to the Kaiser litigation. According to Mr. Huffman, either Mr. Frates was present when the assertion was made or Mr. Merrick was authorized to speak for Mr. Frates. *See* Doc. No. 371, Huffman Deposition, p. 139, ln. 25 to p. 145, ln. 23 and p. 211, ln. 5–17.

After learning of the Kaiser litigation and the *lis pendens,* State's management asked State's lawyers to prepare a legal opinion regarding the Kaiser litigation. That opinion was prepared in letter form by Mr. Petty on March 16, 1987. Doc. No. 179, Bates # 2956–57, Affidavit of John L. Farrell. Mr. Petty's letter was sent to the FHLBB to notify the FHLBB that an adversary proceeding had been filed which might affect State's interest in the Sierra property. Mr. Petty outlined the history of the transfer of the Sierra property from Kaiser to the individual members of the Frates Group, including Mr. Frates. Mr. Petty explained the adversary proceeding as follows:

> Insofar as it might affect State Federal, the Complaint essentially alleges that the real estate, including Sierra, was transferred to the Frates Group on April 2, 1985 for less than adequate consideration at a time when Kaiser was insolvent. Among other things, the Complaint seeks a judgment voiding the transfer of properties to the Frates Group.

---

**29.** The deeds of record only account for 76.3158% of the Sierra property. There is no

evidence of how Equivest acquired the other 23.6842% of the Sierra property.

*Id.* at 5194. Mr. Petty stated that he had been informed by a representative of the Frates Group that the group intended to "vigorously defend" Kaiser's claims.

Mr. Petty also informed the FHLBB that a *lis pendens* had been filed against the Sierra property. Mr. Petty noted that the "potential of [the Sierra property] to improve the capital position and profitability of State Federal beyond the initial transfer value is substantial." Doc. No. 179, Bates # 5196. According to Mr. Petty, the existence of the *lis pendens* could adversely affect the ability of State to further develop the Sierra property. Mr. Petty informed the FHLBB that Equivest and State would "pursue vigorously all available means" to remove the *lis pendens. Id.*

The last section of Mr. Petty's letter is titled "Protection of State Federal." In that section, Mr. Petty states as follows:

State Federal, as a bona fide purchaser ... should be insulated from a loss of Sierra as a result of the Kaiser action. In any event, ***Equivest and the Frates Group have warranted good title to the property and are responsible for any loss which might result.***

Doc. No. 179, Bates # 5196 (emphasis added). In his deposition, Mr. Petty defines the Frates Group as the original owners who had contributed the Sierra property to Equivest. Doc. No. 357, Petty Deposition, Exhibit 5, p. 135, ln. 9–15. Mr. Petty testifies that what he meant by the language emphasized above was that there was a warranty that State had good title to the Sierra property, and if there was a failure of that warranty of good title which resulted in a loss to State, then Equivest and/or the Frates Group would have to make up the loss. *Id.* at pp. 134–139. Mr.

Huffman believes that the emphasized language was added by Mr. Petty as a result of Mr. Merrick's comments to Mr. Petty made during the conference call which took place shortly after Mr. Frates was served with the Complaint in the Kaiser litigation.

State's board of directors held a meeting on March 18, 1987 in part to discuss Mr. Petty's letter. John L. Farrell and Mr. Frates, as directors, were present at the meeting. Mr. Huffman was also present, as president of Equivest, State's sole shareholder. Mr. Huffman distributed and read Mr. Petty's letter to State's board of directors. Mr. Huffman informed the board that efforts were being taken to remove the *lis pendens* from the Sierra property. Mr. Huffman also indicated that he had met with and discussed Mr. Petty's letter with the FHLBB. Doc. No. 179, Bates # 4525–32. After extended discussion, State's board instructed the secretary to recite in the minutes that the board "support[ed] management and the related position of [State] as discussed in [Mr. Petty's] letter." *Id.* at 4529. There is no indication that Mr. Frates objected in any way to the representation that the Frates Group had "warranted good title" to the Sierra property and was "responsible for any loss which might result." *Id.* at 5196.[30]

Mr. Huffman has testified that at the March 18, 1987 board meeting Mr. Frates "acknowledged the intention of making State Federal whole from any losses arising from the Kaiser Steel bankruptcy litigation." Doc. No. 341, Affidavit of Thorn Huffman, p. 2, ¶ 3. Mr. Huffman testified that Mr. Frates always spoke in the third person when discussing this subject—saying that "we" will stand behind the Sierra

---

**30.** The FDIC suggests that the board's discussion of Mr. Petty's letter was at Mr. Frates' request. The minutes are, however, ambiguous. Mr. Frates was chairman of State's board of directors at the time. Nevertheless, the minutes state that William M. Waller, State's president, "acted as Chairman of the meeting." Doc. No. 179, Bates # 4525. The

minutes reflect that Mr. Petty's letter was distributed and discussed "[a]t the request of the Chairman." *Id.* at 4529. It is a reasonable inference, therefore, that Mr. Petty's letter was discussed at the request of Mr. Waller, the chairman of the meeting, not at the request of Mr. Frates, the chairman of the board.

property and make State whole. Mr. Huffman understood the "we" to mean the people, including Mr. Frates, that contributed the Sierra property to Equivest. However, Mr. Frates never defined "we" when making his statements to State's board. Doc. No. 371, Huffman Deposition, p. 152, ln. 3 to p. 153, ln. 10. David Fist, one of State's directors in March 1987, corroborates Mr. Huffman's testimony. Mr. Fist testified that shortly after the Kaiser litigation commenced, Mr. Frates said "something to the effect that State Federal would be protected against any loss as a result of the [Kaiser] litigation." *Id.* Fist Deposition, pp. 241–42.

Mr. Farrell was also present at the March 18, 1987 board meeting and he has filed an affidavit in this case. In his affidavit, Mr. Farrell does not corroborate or contradict Mr. Huffman's recollection that Mr. Frates expressed an intention to make State whole from any losses resulting from the Kaiser litigation at the March 18th board meeting. Mr. Farrell simply states that he was one of the directors that requested that Mr. Petty prepare an explanation of the Kaiser litigation in the first place. Apparently, Mr. Farrell was persuaded by Mr. Petty's letter. Mr. Farrell testified that because he believed State to be a good faith purchaser of the Sierra property and because Equivest and some Frates-related entity were "warrantors" of good title he felt that "there was no risk of loss to State as a result of the Kaiser litigation." Doc. No. 179, Bates # 2956, ¶¶ 7–9.

State's management hired a law firm to represent State in the Kaiser adversary proceeding which was being conducted in Denver, Colorado. State received its first invoice sometime in April or May of 1987. According to Mr. Huffman, when State received the bill Mr. Huffman expected the Frates Group to pay the bill. Mr. Huffman alleges that he knew that the Frates Group did not have the money to pay the bill, so Mr. Merrick made a deal with State on behalf of the Frates Group. According to Mr. Huffman, the deal required State to pay the legal fees associated with the Kaiser adversary proceeding. Mr. Frates and the other members of the Frates Group were to reimburse State when the Kaiser litigation was over. Doc. No. 371, Huffman Deposition, p. 159, ln. 19 to p. 161, ln. 18. Mr. Huffman testified that the Frates Group's obligation to reimburse State's legal expenses was raised at every State board meeting because the board had to approve a monthly schedule of attorney fees, which included fees specifically designated as being spent on the Kaiser litigation. *Id.* at p. 164, ln. 4 to p. 165, ln. 9 and p. 185, ln. 13–23. *See also* Doc. No. 372, Deposition Exhibit 174 (State's Monthly Legal Expense Breakdown).

Max K. Naegler, Equivest's general counsel, vice-president and secretary, prepared a memo that was presented to State's board of directors at the October 21, 1987 board of directors meeting. Between March 1987 and October 1987, State was named as a party to the Kaiser adversary proceeding and Equivest, State and Mr. Frates had worked out an interim settlement with Kaiser. Mr. Naegler's memo outlined for State's board and recommended approval of the interim settlement. *See* Doc. No. 179, Bates # 5308–5311. Mr. Naegler advised State's board that State had two "very strong" defenses—State was a bona fide purchaser and at all relevant times Kaiser was solvent and the transaction was fair to Kaiser. Mr. Naegler advised State's board that he believed that State would "ultimately prevail in the litigation." Despite this confidence in the ultimate outcome, Mr. Naegler advised State's board that it was in State's best interest to approve the interim settlement worked out by the parties. *Id.*

Pursuant to the interim settlement agreement, $55,000.00 per gross acre received as proceeds from the sale of any parcel of the Sierra property was to be escrowed pending resolution of the adversary proceeding ("the Kaiser escrow account"). State was to continue funding the

Kaiser escrow account until $10,200,000.00 had been escrowed. State was, however, to fully fund the escrow account no later than the fourth anniversary of the account's establishment. State's obligation to fund the escrow account was secured by a deed of trust to the Sierra property and by the Frates Group's guarantee of State's obligation to fund the escrow account. As long as the Kaiser escrow account was properly funded, Kaiser's sole recourse against State was to proceed against the funds in the Kaiser escrow account.

Mr. Naegler concluded his memo with the following: "**The Frates Group** has guaranteed State's obligation and **stands behind its warranty of title to State.**" Doc. No. 179, Bates # 5311 (emphasis added). Mr. Naegler has testified that with this concluding sentence he was referring only to the warranties contained in the deeds conveying the Sierra property, which were executed by the members of the Frates Group. Mr. Naegler was, however, uncertain as to whether those deed warranties would as a matter of law be enforceable by State (i.e., whether the deed warranties would in fact flow from the members of the Frates Group to Equivest and then from Equivest to State). Doc. No. 357, Exhibit 11, Naegler Deposition, pp. 108–111.

Mr. Naegler presented and explained his memo to State's board of directors at their October 21, 1987 meeting. Mr. Frates and Mr. Huffman, as Equivest's president, were present at the meeting. "Upon motion duly made, seconded and unanimously carried, the Board of Directors approved the interim settlement agreement" outlined in Mr. Naegler's memo. See Doc. No. 179, Bates # 4576–4582, at 4581. There is no evidence that Mr. Frates objected to the representation in Mr. Naegler's memo that "[t]he Frates Group ... stands behind its warranty of

title to State." Doc. No. 179, Bates # 5311. The interim settlement agreement was executed by the parties—Equivest, State, Kaiser and Mr. Frates—on November 3, 1987. See Doc. No. 189, Bates # 5422–5440.[31]

Pursuant to the NHA and regulations passed by the FSLIC, Equivest, as State's holding company, was required to file monthly reports with the FSLIC. See 12 U.S.C. § 1730a(b)(2). Mr. Huffman filed such a report on February 23, 1988 as Equivest's president. According to Mr. Huffman, the report was prepared by Max Naegler, as Equivest's general counsel. At the time the report was prepared, Mr. Frates was serving as chairman of Equivest's board of directors and Mr. Frates owned all of Equivest's common stock. In a section titled "Pending Legal Proceedings," Mr. Huffman described the Kaiser litigation and attached a copy of Mr. Petty's March 16, 1987 letter. Doc. No. 179, Bates # 5460–64. Mr. Huffman also advised the FSLIC that the interim settlement agreement had been executed. Mr. Huffman concluded this section of the report with the following statement: "**J.A. Frates and certain other Frates-related parties in the litigation have agreed to indemnify [State] from any loss resulting from [the Kaiser litigation].**" Id. at 5463 (emphasis added).

After Equivest acquired State, several issues arose in connection with the FHLBB's Conversion and Acquisition Resolutions. On March 14, 1988, Mr. Huffman, again as president of Equivest, sent a letter to the FHLBB addressing some of the issues generated by the acquisition. At the time the letter was sent, Mr. Frates was still chairman of Equivest's board of directors and sole owner of Equivest's common stock. Mr. Huffman summarized the Kaiser litigation and mentioned the

---

**31.** The interim settlement agreement defined the "Frates Group" as Mr. Frates and other individuals and Equivest Associates, an Oklahoma general partnership consisting of Mr. Frates and other individuals. Doc. No. 179, Bates # 5424, ¶ 12. This "Frates Group" is defined differently than the "Frates Group" that transferred the Contributed Property to Equivest. See n. 6, supra.

escrow account created by the interim settlement agreement. Doc. No. 179, Bates # 5469–5471. Mr. Huffman concluded his discussion with the following paragraph:

> Frates, of course, conveyed the Sierra property to State with a warranty of good title. In the event the outcome of the [Kaiser] litigation should result in loss of any portion of the escrow account, Frates would be obligated to reimburse State by contributing additional capital. Frates continues to vigorously defend its position in [the Kaiser] litigation and has no reason to believe it will not ultimately prevail.

*Id.* at 5471.[32]

The FHLBB conducted a regular examination of Equivest and State from June 20, 1988 to July 29, 1988. State did not receive a copy of the report until December 22, 1988. Doc. No. 179, Bates # 5744–48. The report states that "[m]ajor policy decisions are made and implemented by Joseph A. Frates and/or Thorn Huffman and Max Naegler who serve as directors and officers for [State's] holding company, Equivest Financial Company." *Id.* at 3599. The report also notes that "an adverse decision in pending litigation involving [the Sierra property] could adversely impact [State's] capital." *Id.* at 3598. According to the drafters of the report, State's management had "contended that whatever exposure exists [because of the Kaiser litigation would] likely be covered by insurance companies." *Id.* at 3601.

Concerned with what it believed to be numerous factual errors in the FHLBB's July 1988 examination report, State's board of directors authorized Mr. Huffman to draft a response to the report. The board reviewed Mr. Huffman's response at its February 15, 1989 meeting and specifically approved and ordered its delivery to the FHLBB at a special February 24, 1989 meeting. *See* Doc. No. 179, Bates # 4683–93. By this time, Mr. Huffman had become chairman of State's board of directors, replacing Mr. Frates, and State's chief executive officer. Mr. Frates was present at both of these board meeting and he expressed no reservations regarding the language in Mr. Huffman's response.

Mr. Huffman took issue with the report's characterization that major policy decisions were made by Messrs. Frates, Huffman and Naegler. Mr. Huffman's response used the following language:

> The Board feels this statement is incorrect and has no idea what information prompted the examiner to make this statement. Mr. Huffman has certainly maintained an active role, but never had the authority to unilaterally impose major policy decisions on [State], all of which are debated and approved, rejected or modified by the Board.

*Id.* at 5789. Mr. Huffman also took issue with the report's statement that losses resulting from the Kaiser litigation would be covered by insurance. Mr. Huffman used the following language:

> Management has never contended that whatever exposure exists in the Kaiser/Sierra litigation would be covered by insurance. ***Management has continually relied on a warranty of title from [Equivest] and the contributor of the property to [Equivest] as outlined in***

---

**32.** The reference to "Frates" in this paragraph is ambiguous. It is not clear whether, by using "Frates," Mr. Huffman is referring to the individual defendant in this case or to the Frates Group. Previously, in Equivest's February 1988 report to the FSLIC, Mr. Huffman referred to the individual defendant in this case as "J.A. Frates." Mr. Huffman's use of the pronouns "it" and "its" in the last sentence of the paragraph strongly suggests that Mr. Huffman was referring to the Frates Group, of which Mr. Frates is obviously a member, and not to Mr. Frates directly. Mr. Huffman and Mr. Frates have also testified that the term "Frates Group," when used in communications between State and the FHLBB, was a "collective noun used as a shorthand to refer to the individual investors in Equivest." Doc. No. 216, Affidavit of Thorn Huffman, Exhibit 13, ¶ 12; and Doc. No. 300, Mr. Frates' Answers to Plaintiff's Interrogatories, p. 2. *See also* n. 6, *supra.*

*[Mr. Petty's March 16, 1987] letter* to the FHLBB OGC.

*Id.* 5795 (emphasis added). *See also* Doc. No. 371, Huffman Deposition, p. 178, ln. 1 to p. 179, ln. 6.

On July 24, 1989, the FHLBB sent a letter to State which was a reply to the issues raised in Mr. Huffman's February 24, 1989 letter, which was itself a response to the FHLBB's June 1988 examination report. A copy of the FHLBB's letter is not in the record. On August 29, 1989, Mr. Huffman, as chairman of State's board of directors prepared a letter as a sur-reply to the FHLBB's July 24, 1989 letter. Doc. No. 179, Bates # 5934–37.[33] Mr. Huffman's sur-reply was unanimously approved by State's board of directors at its August 29, 1989 meeting at which Mr. Frates was present. *Id.* at 4745–47.

Mr. Huffman's sur-reply letter reiterated that there was no direct insurance coverage that would make up any losses suffered by State as a result of the Kaiser litigation. Mr. Huffman then referred the OTS "to the last page of the March 16, 1987 letter from Charles W. Petty, Jr. . . . in which *[State's] attorney states it has a warranty of title as its primary method of recovery should the Frates Group lose its litigation with Kaiser Steel.*" *Id.* at 5935 (emphasis added). Mr. Huffman went on to explain that

> State has incurred legal expenses for its own defense from day one and will recover those expenses through the war-

ranty of title claim or through any settlement that is reached.

. . .

> The Board can assure you that it is doing everything it can to protect its capital and its position in this matter, but has virtually no involvement or control over Frates' negotiations or handling of this litigation.

*Id.* at 5935–36.

The OTS conducted a regular examination of State from August 15, 1989 to January 12, 1990. The OTS issued an interim report in October 1989 and a final report in early 1990.[34] The interim and final reports indicated that State was insolvent. Doc. No. 179, Bates # 5945. The final report notes two instances of apparent conflicts of interest. The conflict relevant to this litigation is described as follows:

> Also noted was the *failure of [State's] board to seek recourse against (or indemnification from) principal shareholder Mr. Frates or Equivest Financial Corporation regarding losses associated with the conveyance of the Sierra Gateway* property from F.G. Associates to [State]. The property is subject to litigation that exposes [State] to significant loss potential. . . .

*Id.* at 3661 (emphasis added).[35]

The interim and final reports also indicate that State was showing as a receivable the contingent escrow account created

---

**33.** Mr. Huffman's sur-reply letter was actually addressed to the OTS because with the passage of FIRREA on August 9, 1989, the FHLBB ceased to exist and was succeeded by the OTS.

**34.** The interim report was personally presented to State's board of directors by OTS agents at the board's October 18, 1989 meeting. Doc. No. 179, Bates # 4754–59. The FDIC suggests that at the meeting, the board did not object to the interim report. The FDIC's characterization is misleading. The board received the report from the OTS agents and then agreed to take no action at the October 18th meeting. The board agreed to table dis-

cussion of the interim report until it had a chance to review the report with counsel. The board set a special board meeting for October 23, 1989 to discuss the interim report. There are, however, no minutes in the record which reflect whether a meeting was held on October 23, 1989.

**35.** This is the first reference in the record to any entity other than Equivest as the entity who conveyed the Sierra property to State. The grant deed of record reflects that Equivest and not "FG Associates" conveyed the Sierra property to State. *See* Doc. No. 216, Exhibit 32. *See also* n. 7, *supra.*

by the Kaiser interim settlement agreement. *Id.* at 3709 and 5945. On November 10, 1989, during the examination, the FHLBB required State to make the following accounting adjustment:

> [W]rite-off contingent Kaiser receivable or obtain indemnity agreement from Equivest to [State], collateralized by readily marketable collateral, for 150 percent of the receivable balance.

*Id.* at 3669–70.[36]

The interim report lodged the following criticism against State's board:

> [State] has made no effort to require the Frates Group to assume the risk associated with the potential loss of the litigation. Management's reliance upon the Frates Group for repayment has been based only upon oral representations by the Frates Group to make the institution whole in the event of an unfavorable determination by the courts. Financial statements and statements of ownership of FG Associates (The Frates Group) have been requested but not provided. It is management's opinion that the partnership does not have the wherewithal to make good on the amounts in question should the court decide in favor of Kaiser.
>
> [State] has paid and capitalized $254,000 in legal expenses resulting from the litigation. Additionally, accrued interest receivable of $284,000 related to the receivable [i.e., the Kaiser escrow account] is on [State's] books.
>
> It is the examiner's opinion that the receivable [i.e., the Kaiser escrow account], legal expenses, and interest receivable should be classified as a loss.

[State's] failure to institute appropriate action against The Frates Group to force that entity to assume the risk of loss in the litigation process represents a serious conflict of interest.

Doc. No. 179, Bates # 5946.[37]

Mr. Huffman testified that after the interim report was issued, Mr. Frates again "acknowledged the intention of making State Federal whole from any losses arising from the Kaiser Steel bankruptcy litigation." Doc. No. 341, Affidavit of Thorn Huffman, p. 2, ¶ 3. According to Mr. Huffman, in response to the criticism leveled against State's board of directors in the interim report about the board's conflict of interest with Mr. Frates, Mr. Frates again assured State's board that if State had any exposure, "we" would make it good. Mr. Frates never used the word "warranty" or "indemnify." According to Mr. Huffman, Mr. Frates simply assured State's board that "they" would make State Federal whole if State had a loss on the Kaiser Steel bankruptcy. By loss, Mr. Huffman understood Mr. Frates to be referring to legal fees incurred by State and any portion of the Kaiser escrow account that might be lost to Kaiser, plus interest. *See* Doc. No. 371, Huffman Deposition, p. 155, ln. 2 to p. 158, ln. 11 and p. 181, ln. 10–25.

On February 16, 1990, the Director of the OTS declared State insolvent and appointed the RTC as State's receiver. On November 28, 1990, Kaiser and State, with the RTC acting on State's behalf, settled the Kaiser litigation as between themselves. *See* Doc. No. 179, Bates # 6034–47.[38] The settlement was, however, subject to approval by the bankruptcy court.

---

36. Due to certain "examination approaches" which were mandated by the OTS, the examiner in charge, S. Douglas Williams, was critical of the final report issued by the OTS. Mr. Williams drafted a letter to voice his dissatisfaction. *See* Doc. No. 358, Exhibit 15. Mr. Williams' criticism was, however, focused on the methods used to value the Contributed Property. There is no indication that Mr. Williams disagreed with the conclusions cited in this footnoted paragraph.

37. Mr. Frates argues that the Court should ignore the portions of the FHLBB's final and interim examination reports relied on by the FDIC because they are hearsay. The undersigned does not agree. Those portions of the reports relied by the FDIC are admissible under either Fed.R.Evid. 803(8) and/or 807.

38. The Sierra property is actually owned by a wholly owned subsidiary of State. *See* n. 5, *supra*. As part of the purchase and assumption that State went through after it was put into receivership, it appears that a new finan-

Pursuant to the settlement agreement the parties agreed that Kaiser would dismiss the adversary proceeding with prejudice in exchange for 60% of the entire balance of the escrow account established by the interim settlement agreement in November 1987. *Id.* at 6049–40, ¶¶ 3.1, 3.2 and 3.4 The final settlement agreement specifically provided that State was not releasing any claim it might have against Equivest or Mr. Frates. *Id.* at 6043–44, ¶ 3.10.

Kaiser filed a motion for approval of the settlement with the bankruptcy court on December 6, 1990. *See* Doc. No. 170, Bates # 6048–50. The record does not contain an order from the bankruptcy court approving the settlement. The undersigned assumes, however, that the settlement was approved because there is documentary evidence establishing that the escrow agent actually disbursed funds from the Kaiser escrow account, with 60% (approximately $7.2 million) of the fund going to Kaiser and 40% (approximately $4.8 million) of the fund going to State. *See id.* at 6053–59.

Max Naegler has testified that the RTC never informed Equivest or Mr. Frates that it was going to settle the Kaiser litigation. When, Mr. Naegler learned of the settlement by "accident," he and Tom English drafted a letter for Equivest to send to the RTC, as State's receiver, objecting to the proposed settlement. Doc. No. 357, Exhibit 11, Naegler Deposition, p. 154. A copy of this letter cannot be found and is, therefore, not in the record. There is no evidence that this objection was ever communicated to the bankruptcy judge presiding over the Kaiser litigation. *See, e.g.,* Doc. No. 371, Merrick Deposition, p. 137–38. Mr. Naegler testified that to his knowledge, the RTC never asked Equivest or Mr. Frates to defend the Kaiser trustee's claim to the Sierra property. Accord-

ing to Mr. Naegler, the RTC's settlement of the Kaiser litigation was "ridiculous." Doc. No. 216, Exhibit 15, ¶ 7. Mr. Frates also testified that the RTC did not inform him that it was going to settle the Kaiser litigation on behalf of State, and that he did not learn about the settlement until after the settlement agreement had been signed. Mr. Frates states that the Kaiser litigation was settled for "an absurd settlement amount, indicating gross incompetence on the part of the [RTC]." Doc. No. 216, Affidavit of Joseph A. Frates, Exhibit 16, ¶ 15. Mr. Merrick learned about the RTC/Kaiser settlement from his lawyers, who were involved in the litigation. Doc. No. 357, Merrick Deposition, p. 136, ln. 20–25.

Mr. Frates has submitted an affidavit by V. Burns Hargis. Mr. Hargis purports to be an expert on what constitutes a "reasonable" director of a savings and loan association. Mr. Hargis states that he reviewed the evidence on which the FDIC relies and that in his opinion "a reasonable director under similar circumstances would not have considered the oral and written representations contained in the documents and testimony ... as an intention to indemnify or protect State Federal from any loss arising from the Kaiser Steel litigation beyond the protection contained in the warranty of title contained in the Sierra deeds...." Doc. No. 358, Exhibit 21, ¶ 4, Hargis Affidavit. Mr. Hargis also opines that it would have been "unreasonable for a director of State Federal, or for the [FHLBB], or the [OTS], to rely on the representations contained in the documents and testimony ... as creating an enforceable agreement to protect or indemnify State Federal beyond the protection encompassed in the warranty of title contained in the Sierra deeds...." *Id.* at ¶ 5. Mr. Hargis believes that if a reason-

cial institution, New Federal, was established by the OTS. The RTC was appointed as the conservator of New Federal. RTC, as receiver of State, conveyed some of State's "acceptable" assets, including State's stock in its wholly owned subsidiary, which owned the Sierra property and the Kaiser escrow ac-

count, to New Federal. New Federal was then substituted as a party for State in the Kaiser adversary proceeding. Thus, it was actually the RTC, as New Federal's conservator, and Kaiser that settled the Kaiser litigation. *See* Doc. No. 179, Bates # 6035–38, ¶¶ 1.6 and 2.6.

able director "had believed that the representations contained in the documents and testimony ... could constitute an agreement to protect or indemnify State beyond a warranty of title, that director would have required that Mr. Frates execute a written agreement setting out the terms of his obligation." *Id.* at ¶ 6.

### B. There Are Genuine Issues Of Material Fact Regarding the Existence of a Promise by Mr. Frates And/or the Frates Group to Indemnify State Against Any Loss As A Result of the Kaiser Litigation.

 The Court must decide whether the evidence summarized above is sufficient to create an indemnity agreement enforceable by the FDIC, as State's receiver, against Mr. Frates. The FDIC argues that the evidence summarized above reflects that Mr. Frates made an oral promise to indemnify State generally against any loss State might suffer in connection with the Kaiser litigation. Mr. Frates argues that, at most, the evidence summarized above establishes that he agreed to do nothing other than stand behind any deed warranties which resulted from his transfer of the Sierra property to Equivest. Because Mr. Frates only conveyed a 1.1844% interest in the property, Mr. Frates argues that any liability arising out of the deeds would be limited to 1.1844% of any loss suffered by State. The Court must, therefore, determine whether one of these interpretations of the evidence is correct as a matter of law or whether there are material questions of fact which a jury will have to resolve in order to determine which interpretation to give the evidence summarized above. *See* Fed.R.Civ.P. 56; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The undersigned finds that the summary of evidence presented in the previous section demonstrates that there are many questions of material fact regarding the existence of an indemnity agreement enforceable against Mr. Frates. These questions include (1) the content and timing of statements made by Mr. Frates; (2) the meaning of Mr. Frates' statements given the context within which they occurred; (3) the content and timing of statements made by others, including statements made by Messrs. Petty, Merrick, Huffman and Naegler; (4) the meaning of the statements made by others given the context within which they occurred; (5) the degree to which Mr. Frates adopted, failed to object to or authorized the statements made by others; and (6) the nature and identity of the Frates Group.

 Mr. Frates argues that as a matter of law the evidence summarized above can establish nothing more than that he was communicating to State's board of directors and the FHLBB that he intended to stand behind the warranties which arose when he executed a grant deed conveying his interest in the Sierra property to Equivest. However, Equivest and not Mr. Frates was State's grantor of the Sierra property. As a matter of California law [39] there is a substantial question as to whether State would in fact be able to enforce a deed warranty contained in a deed conveying the Sierra property to Equivest. *See* Cal.Civil Code § 1113 (West 1997); and *Babb v. Weemer,* 225 Cal.App.2d 546, 550, 37 Cal.Rptr. 533 (Cal.Ct.App.1964). In other words, State might be able to enforce a deed warranty against Equivest because Equivest was State's grantor. However, under California law, State would not be able to assert a deed warranty against Mr. Frates because Mr. Frates was never State's direct grantor. When one views the statements upon which the FDIC relies to establish an indemnity agreement through the lens of California

---

**39.** The Sierra property is located in California. The law of the state where property is situated defines the nature and obligations arising from an instrument conveying the property. *Kline v. Mueller,* 135 Okla. 123, 276 P. 200 (1928). Thus, California law governs the enforceability of any warranty which might arise out of a deed conveying California real property.

law, questions of fact are raised regarding the meaning that should be attached to the statements, even those which specifically use the word "warranty." If the statements relied on by the FDIC do nothing other than reaffirm Mr. Frates' or the Frates Group's deed warranties, then all of the statements were nullities as far as State is concerned because there were never any deed warranties flowing from Mr. Frates or the Frates Group to State.[40]

There are, therefore, many questions of material fact regarding the existence of a promise by Mr. Frates and/or the Frates Group to indemnify State against any loss in the Kaiser litigation. The parties have each advanced several arguments which they believe resolve this case as a matter of law, despite the existence of any factual questions. The undersigned will, therefore, review the parties' arguments to determine whether some principle of law resolves the FDIC's Second Claim for Relief despite the questions of fact identified above.

### C. The Parties' Arguments In Favor of Summary Judgment As a Matter of Law

#### 1. The FDIC's Argument—*Dench and 12 U.S.C. § 1823(e)*[41]

■ The FDIC relies on 12 U.S.C. § 1823(e) and the United States Supreme Court's decision in *D'Oench, Duhme and Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), as extended in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). The undersigned will collectively refer to the doctrine enshrined in these cases and the statute as the *D'Oench* doctrine. When the FDIC is acting in its capacity as the receiver of a depository institution to enforce an agreement (i.e., an asset) held by the institution, the *D'Oench* doctrine prohibits the party against whom the agreement is sought to be enforced from asserting any defense based on any agreement, promise, action or representation which is not clearly reflected in the depository institution's records.[42] The only exception is a defense that would demonstrate that the agreement held by the institution was void *ab initio*.

For example, if a failed institution's records contained a promissory note signed by John Smith and if the FDIC sued Mr. Smith to recover on the note, Mr. Smith would have no defense except (1) a defense showing that the note was void *ab initio*, or (2) a defense which could clearly be established with the institution's own records. *See, e.g., FDIC v. Hennessee*, 966 F.2d 534 (10th Cir.1992); and *FDIC v. Waldron*, 630 F.2d 239 (4th Cir.1980)

---

**40.** Mr. Frates argues that "if the parties' [sic] incorrectly assumed that the Sierra deeds contained warranties which they did not, the remedy is not to fabricate from thin air a separate oral promise not contemplated by anyone, but instead, the remedy is to reform the deeds to conform with the understanding *every party to the transaction had*." Doc. No. 377, p. 22 (emphasis original). The undersigned does not, however, accept Mr. Frates' premise that the evidence clearly establishes that all parties shared the same misapprehension regarding the extent and scope of the deed warranties applicable in this case. As the undersigned has already found, the evidence is also in dispute regarding whether all parties in fact understood the statements at issue in this lawsuit to be reaffirmations of previous, non-existent deed warranties or whether the statements were in fact an expression of a new obligation to indemnify State against loss in the Kaiser adversary proceeding. Mr. Frates' offer to reform the relevant deeds is also pointless in light of the fact that Mr. Frates also asserts several defenses to any attempt by the FDIC to enforce a deed warranty.

**41.** *See* Baxter Dunaway, *et al., FIRREA: Law and Practice*, Ch. 15 (1994) for a thorough discussion of the *D'Oench* common law doctrine and its interplay with § 1823(e).

**42.** The *D'Oench* doctrine was designed to insure that when the FDIC expends moneys entrusted to it to purchase the assets of a failed institution, the FDIC can rely on the institution's records and will not be risking an impairment of the assets through an agreement not contained in the institution's records.

(holding that a party to a contract in the institution's files may not assert as a defense the fact that the contract was orally modified); *Langley,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (holding that a defense based on fraudulent misrepresentations made by the institution's loan officer could not be asserted in an action to enforce a promissory note).

 The FDIC argues that the *D'Oench* doctrine prohibits Mr. Frates "from denying the enforceability of, or asserting any of his defenses to, his indemnity agreement...." Doc. No. 222, pp. 58–59. The FDIC's argument is, however, only partially correct. The *D'Oench* doctrine does prohibit Mr. Frates from raising any defenses to his indemnity agreement which are based on an agreement which is not reflected in State's records. The *D'Oench* doctrine does not, however, prohibit Mr. Frates from demonstrating that as a matter of law the agreement actually reflected in State's records is not enforceable.

 The *D'Oench* doctrine prohibits Mr. Frates from using evidence which is not reflected in State's records to show that the unambiguous terms of the indemnity agreement in State's records are different than they appear. Here, however, the FDIC does not have a document labeled "Indemnity Agreement," the unambiguous terms of which Mr. Frates is trying to alter with evidence of some side agreement that is not reflected in State's records. Rather, the FDIC has pieced together an oral indemnity agreement from many separate documents in State's records. Mr. Frates is certainly entitled to demonstrate that the documents relied on by the FDIC to establish an oral indemnity agreement do not in fact establish an indemnity agreement as a matter of law. In other words, Mr. Frates may demonstrate, without attempting to alter the terms of the agreement, that the agreement established by State's records is not enforceable as a matter of law because the terms of the agreement are too

indefinite or because the agreement cannot be validated through the doctrine of consideration or the doctrine of promissory estoppel. The *D'Oench* doctrine also does not prohibit Mr. Frates from demonstrating that under the terms of the agreement as reflected in State's records, he is not liable given the facts of this case. *See, e.g., Howell v. Continental Credit Corp.,* 655 F.2d 743, 747 (7th Cir.1981); *FDIC v. Sather,* 488 N.W.2d 260, 267 (Minn.1992); and *FDIC v. Panelfab Puerto Rico, Inc.,* 739 F.2d 26, 30 (1st Cir.1984). Thus, the *D'Oench* doctrine does not prohibit Mr. Frates from raising any of the legal defenses addressed in the next section.

### 2. Mr. Frates' Arguments

#### a. *Contractual Validation*

Mr. Frates argues that if there is a promise of indemnification in this case, it is not an enforceable promise. The law of contracts uses several validation devices to determine which promises are enforceable through an action at law. One of these validation devices is the doctrine of consideration and another is the doctrine of promissory estoppel. *See* John Edward Murray, Jr., *Murray on Contracts,* Chapter 3 (3rd ed.1990) for a catalog of the various contract validation devices. The FDIC argues that both of these doctrines support enforcement of the indemnification promise at issue in this case.

#### i. *The Consideration Doctrine*

 Two elements must be established for a promise to amount to an enforceable contract under the doctrine of consideration: (1) a bargained-for-exchange, of (2) something which the law regards as valuable. The "value" element is usually expressed as something which is either a benefit to the promisor or a legal detriment to the promisee. The exchange element is usually expressed as follows—the promise must induce the benefit or legal detriment and the legal detriment or benefit must induce the promise. *See Petroleum Refractionating Corp. v. Kendrick Oil*

*Co.*, 65 F.2d 997, 998 (10th Cir.1933); and John Edward Murray, Jr., *Murray on Contracts*, §§ 55–60 (3rd ed.1990).

■■■ Mr. Frates states, with no additional argument, that "there is no evidence of any consideration given Mr. Frates." Doc. No. 364, p. 23. The FDIC argues that there are at least two benefits conferred on Mr. Frates, one from the FHLBB and one from State, and that these benefits induced Mr. Frates' indemnity promise. *See* Doc. No. 370, pp. 39–40. First, the FDIC argues that because of Mr. Frates' indemnity promise, the FHLBB delayed taking certain regulatory or enforcement actions against either State or Equivest, and that this forbearance by the FHLBB benefited Mr. Frates as an Equivest shareholder. There is, however, no evidence in the summary judgment record that the FHLBB was about to take a specific regulatory or enforcement action which it ultimately decided not to take because of Mr. Frates' indemnity promise (i.e., no evidence something of "value" was in fact received). There is also no evidence that the FHLBB's forbearance specifically induced Mr. Frates' indemnity promise or that Mr. Frates' indemnity promise induced specific forbearance by the FHLBB (i.e., no evidence of a "bargained-for-exchange").

Second, the FDIC argues that there is evidence that State "agreed to advance its defense costs and to delay seeking reimbursement from Equivest and/or the Frates Group until the Kaiser Steel litigation was over. [According to the FDIC, t]hat act was, in essence the extension of credit to the members of the Frates Group." Doc. No. 370, p. 39–40. The FDIC has the cart before the horse. Any obligation by Mr. Frates or the Frates Group to defend State would have arisen because an enforceable indemnity promise had been made. Prior to an enforceable indemnity promise being made, there was no obligation to defend State. Thus, an agreement by State to advance the cost of its own defense, something it would have to do anyway absent an indemnification agreement, could not have been an inducement for Mr. Frates' indemnity promise. The FDIC admits this fact just a mere four pages later in its brief when it states that "the express agreement to reimburse State Federal for its defense costs ... stands independent from any general promise to 'indemnify.'" *Id.* at p. 44.[43] The undersigned finds, therefore, that neither of the arguments advanced by the FDIC satisfy the elements of the consideration doctrine.

### ii. *The Promissory Estoppel Doctrine*

■■■ Oklahoma recognizes the promissory estoppel doctrine as that doctrine is codified in § of the Restatement (Second) of Contracts. *See Russell v. Board of County Commissioners, Carter County*, 952 P.2d 492, 503 (Okla.1997). The elements of the promissory estoppel doctrine are as follows: (1) a clear and unambiguous promise, (2) foreseeability by the promisor that the promisee would rely upon the promise, (3) reasonable reliance upon the promise to the promisee's detriment, and (4) hardship or unfairness can be avoided only if the promise is enforced. *Russell*, 952 P.2d at 503.

The undersigned has already found that there are material questions of fact regarding whether there was a promise by Mr. Frates to indemnify State against loss in connection with the Kaiser adversary proceeding. Assuming the evidence summarized above establishes an indemnity promise, the undersigned finds that there are also material questions of fact regarding whether it was foreseeable that State would rely on the indemnity promise. There is some evidence that Mr. Frates was an influential member of State's board

---

**43.** Actually, once an agreement to indemnify is established, that agreement, as a matter of law, "embraces the costs of defense" so long as those costs were "incurred in good faith, and in the exercise of reasonable discretion." 15 Okla.Stat. § 427(3). In other words, a separate/express agreement to be responsible for the costs of defense is not necessary.

and that his comments were taken seriously by other board members. This is particularly true in light of the fact that Mr. Frates was also the sole common stockholder of Equivest, State's holding company. Thus, a jury could determine that it was foreseeable that State's board of directors would rely on statements made by Mr. Frates or statements made by others on Mr. Frates' behalf.[44]

■ The remaining element of the promissory estoppel doctrine would require a finding that it was reasonable, given the totality of the circumstances, for State's board of directors to rely on the indemnity promise alleged in this case. The Court must, therefore, determine whether competing inferences can be drawn from the summary judgment record regarding the reasonableness of the reliance by State's board of directors. On the one hand, Mr. Frates argues that there was in fact no reliance and that if there was reliance, he offers the Affidavit of Burns Hargis to demonstrate that the reliance was unreasonable. The FDIC itself has also admitted that the board's reliance was not reasonable. The FDIC admits that State's directors were negligent and/or breached their fiduciary duty to exercise reasonable care and diligence when they failed to require Mr. Frates or the Frates Group to record the details of the alleged indemnity promise "in a less

easily deniable form." Doc. No. 370, p. 43. *See also* Doc. No. 140, Third Amended Complaint, Third and Fourth Claim for Relief. The gravamen of this admission/allegation is that it was unreasonable for the directors to rely on the indemnity promise in its present form without taking steps to ensure that the terms of the promise were set out in more detail. Thus, both parties admit that State's board of directors could not reasonably rely on the indemnity promise in its present form.

■ The FDIC attempts to salvage its promissory estoppel argument by arguing that "mere negligence in believing the honesty and accuracy of another's promises and representations is not enough to deprive an innocent party of their remedies. More specifically, it appears that all that is required is something closer to good faith." Doc. No. 370, p. 43. In other words, the FDIC advances the argument that for purposes of the promissory estoppel doctrine the promisee need only rely on the promisor's promise in "good faith," regardless of whether the reliance was in fact objectively reasonable. Even if the FDIC's argument had merit, the FDIC's semantic argument is belied by the very language used by the Oklahoma Supreme court in *Russell* and the drafters of the Restatement (Second) in § 90. Both *Russell* and § 90 require "reasonable reliance."[45]

---

44. The undersigned also finds that if all of the other elements of promissory estoppel are established, the only way to avoid "hardship and unfairness" to State is to enforce the indemnity promise. Mr. Frates has not addressed this fourth element of the promissory estoppel doctrine and he has offered no other alternative to avoid "hardship and unfairness" to State if the other elements of promissory estoppel are met.

45. The FDIC seeks to support its argument by citing to a number of Oklahoma cases defining the elements of the closely-related doctrine of equitable estoppel. The doctrine of equitable estoppel generally prevents one party from taking a position inconsistent with an earlier action when the earlier action placed the other party at a disadvantage. In defining the elements of equitable estoppel, the Okla-

homa courts have frequently held that the party seeking to assert an equitable estoppel must have in good faith relied on the other party's prior representation or position. *See* Doc. No. 370, cases cited at pp. 43–44. The undersigned notes as an initial matter that all of the cases cited in the FDIC's string cite were decided prior to the Oklahoma Supreme Court's decision in *Russell,* which explicitly defines the elements of the promissory estoppel doctrine. The undersigned has also reviewed the cases cited by the FDIC and finds that Oklahoma's use of "good faith" in the equitable estoppel context is synonymous with its use of "reasonable reliance" in the promissory estoppel context. *See also FDIC v. Palermo,* 815 F.2d 1329, 1338 (10th Cir.1987) (holding that Oklahoma's equitable estoppel doctrine requires reasonable reliance). To es-

The FDIC has failed to demonstrate that there are material questions of fact regarding the reasonableness of the board's reliance. The FDIC is, therefore, unable to satisfy the elements of the promissory estoppel doctrine. Absent consideration and lacking promissory estoppel, the FDIC has failed to offer any device which could be used to validate the indemnity promise at issue here. Consequently, the indemnity promise cannot be enforced with an action at law, and Mr. Frates' motions for summary judgment should be granted as to the Second Claim for Relief. Despite the conclusive nature of this finding, the undersigned will briefly address Mr. Frates' numerous remaining arguments so that the record will be complete on those issues.

### b. *Statute of Frauds*

▬ If the FDIC can establish that an indemnity contract exists, that contract would not be subject to the statute of frauds. A contract of indemnity is not within the Oklahoma statute of frauds and it need not be in writing. *Aalco Construction Co. v. F.H. Linneman Construction Co., Inc.,* 399 F.2d 516, 520 (10th Cir.1968). A guaranty contract is, however, subject to the statute of frauds. *Id.* Mr. Frates argues that there is at least a material question of fact as to whether the agreement established by the evidence summarized above is a guaranty or an indemnity agreement. The undersigned does not agree.

▬ A guarantee would exist under the facts of this case only if there was a preexisting contract between Kaiser and State by which Kaiser was to pay State a certain amount of money. Given these facts, Mr. Frates could have entered into an agreement with State to "make State whole" if Kaiser did not pay. Such an agreement would be a guarantee of Kaiser's prior obligation. *See* 15 Okla.Stat. § 321. There are no facts in the record which could establish a guaranty contract, as that

term is defined in § 321, between State and Mr. Frates or the Frates Group. A contract for indemnity does not presume a pre-existing contract between the indemnitee and the third party. Rather, in an indemnity contract, the indemnitor simply agrees to make the indemnitee whole if the indemnitee becomes liable to the third party at some future date. *See* 15 Okla.Stat. § 421. If the facts of this case establish an obligation at all, it is an indemnity and not a guarantee. *See, e.g., Thomas v. Williams,* 173 Okla. 601, 49 P.2d 557 (1935).

### c. *No Showing of Superior Title and No Notice or Opportunity to Defend*

Mr. Frates argues that before he can be held liable on the FDIC's Second Claim for Relief, the FDIC must first demonstrate that (1) someone other than State had superior title to the Sierra property, and (2) Mr. Frates was given notice and an opportunity to defend title to the Sierra property. As support for his argument, Mr. Frates cites several cases which articulate the prerequisites of an action for breach of a deed warranty. *See* cases cited in Doc. No. 215, pp. 45–48. The FDIC has admitted, however, that its Second Claim for Relief is in no way based on any warranty which might have arisen when Mr. Frates executed a grant deed conveying the Sierra property to Equivest. In fact, it is unlikely that State would be able to enforce any deed warranties in the deed from Mr. Frates to Equivest. *See* Discussion in Section III(B), *supra.* Rather, the FDIC's Second Claim for Relief alleges that the statements made by Mr. Frates and others, after the Sierra property had been conveyed from Equivest to State, obligate Mr. Frates to indemnify State against loss incurred as a result of the Kaiser litigation.

top another party, one's reliance on that parties words or actions must be objectively rea-

sonable.

Mr. Frates was a party to the Kaiser adversary proceeding. He was personally named as a defendant and he was personally served with a summons and a copy of the Complaint in the Kaiser adversary proceeding. Mr. Frates, through counsel, appeared and actively defended himself in the Kaiser adversary proceeding. There is no evidence in the record which would suggest that Mr. Frates was not receiving copies of pleadings, orders and other documents filed in the Kaiser adversary proceeding. Thus, the undersigned finds that Mr. Frates had actual knowledge of Kaiser's claim that State did not have good title to the Sierra property.

 If an indemnity agreement is in fact established against Mr. Frates or the Frates Group, neither Mr. Frates nor the Frates Group would have an absolute right to defend the Kaiser adversary proceeding. Under Oklahoma law,

> [t]he person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity; but the person indemnified has the right to conduct such defense, if he chooses to do so.

15 Okla.Stat. § 427(4).

According to Mr. Huffman, he presented State's first bill for legal fees incurred in connection with the Kaiser litigation to the Frates Group for payment, but the Frates Group was not able to pay the bill. Mr. Huffman testifies that an agreement was reached whereby State would advance the cost of the litigation for the Frates Group and State would be reimbursed by the Frates Group at the conclusion of the Kaiser litigation. This testimony at least creates a question of fact as to whether State ever asked or whether Mr. Frates or the Frates Group ever offered to defend State in the Kaiser litigation. In any event, § 427(4) permitted State to defend the Kaiser adversary proceeding on its own. Mr. Frates cannot, therefore, defend this action on the sole basis that he was denied a right to defend the Kaiser adversary proceeding on behalf of State.

#### d. *Indemnity Against Judgment and Failure to Mitigate Damages*

Mr. Frates argues that if there is an enforceable indemnity agreement in this case, it is an indemnity against "judgment" only. According to Mr. Frates, the only indemnity agreement that can be established from the facts summarized above is an agreement to make State whole only in the event of an unfavorable determination by a court. In other words, Mr. Frates argues that he can have no liability because the Kaiser litigation was settled by the RTC, acting as State's receiver, rather than litigated to judgment. Mr. Frates has, however, not addressed the Tenth Circuit's holding in *Chicago, R.I. & P.R. Co. v. Dobry Flour Mills,* 211 F.2d 785 (10th Cir.1954).

The Tenth Circuit held as follows in *Dobry:*

> Ordinarily, to sustain a claim upon an indemnity contract such as we have here, it is necessary for the indemnitee to prove legal liability to the injured party. However, in Oklahoma and elsewhere in indemnity cases, where the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. 15 Okl.St. Ann. Sec. 427.... A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability. On this subject, the only question which should have been submitted to the jury was whether the [indemnitee] made a reasonable, prudent and good faith compromise and settlement. In determining whether the settlement was made in good faith, the jury should consider the likelihood of a recovery by [the third ·party] against the [indemni-

tee] and the reasonableness of the amount of the settlement, but a prior judicial determination of either question is not necessary.

*Dobry,* 211 F.2d at 788 (internal citations omitted).

If *Dobry's* holding applies in this case, State was authorized to settle the Kaiser litigation and the FDIC would not now be required to actually prove that State would have been liable to Kaiser. *Dobry's* holding applies, however, only if the indemnitor denies liability and refuses to defend. Mr. Frates currently denies any liability under an indemnity contract. There is, however, at least a question of fact in this case regarding whether Mr. Frates or the Frates Group denied liability under an indemnity agreement and refused to assume State's defense of the Kaiser adversary proceeding when the Kaiser adversary proceeding was pending.

*Dobry* holds that even though a settlement is proper where the indemnitor denies liability under the indemnity contract, that settlement must be reasonable and made in good faith. The Court in *Dobry* also held that in an action to recover against the indemnitor, the reasonableness of the settlement is an issue to be resolved by the jury. Mr. Frates has argued that the RTC's settlement of the Kaiser adversary proceeding was ridiculous and that the settlement demonstrates the RTC's gross incompetence. The Tenth Circuit's decision in *Dobry* would indicate that Mr. Frates may defend against indemnitor liability by arguing to the jury that the RTC's settlement of the Kaiser adversary proceeding was unreasonable. Whether *Dobry's* holding can be applied to the RTC's conduct is, however, not at all clear.

The Tenth Circuit has held that a defendant may not point to post-receivership actions taken by the RTC to liquidate a savings and loan association's assets and argue that by the RTC's actions were negligent or failed to mitigate the association's damages. *FDIC v. Oldenburg,* 38 F.3d 1119, 1122 (10th Cir.1994). *See also RTC*

*v. Fleischer,* 871 F.Supp. 1362, 1368–69 (D.Kan.1994). It is not, however, clear whether the Tenth Circuit's decision in *Oldenburg* survives the United States Supreme Court's decisions in *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) and *Atherton v. FDIC,* 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). *See FDIC v. Healey,* 991 F.Supp. 53 (D.Conn.1998) (discussing the effect of *O'Melveny* and *Atherton* on the "no duty" rule espoused by the Tenth Circuit in *Oldenburg* ). Because the effect of *Oldenburg* on *Dobry* and the effect of *O'Melveny* and *Atherton* on *Oldenburg* is not addressed by the parties in their summary judgment pleadings, the undersigned will not address the issue here.

■■■ Mr. Frates' ability to argue the unreasonableness of the Kaiser settlement has been addressed by the parties in pleadings filed in connection with the FDIC's motion to strike Mr. Frates' defenses. *See* Doc. No. 231. The undersigned recommends that, if the Second Claim for Relief survives summary judgment, any ruling on Mr. Frates' ability to challenge the reasonableness of the RTC's settlement of the Kaiser adversary proceeding be made in connection with FDIC's motion to strike defenses, after proper briefing. In any event, summary judgment would not be appropriate because even if Mr. Frates can attack the reasonableness of the Kaiser settlement, there are material questions of fact regarding the reasonableness of that settlement.

### e. *No Prior Judgment Against the Frates Group*

■■■ In Oklahoma, partners in a general partnership are not personally liable on a debt of the partnership. A judgment against the partnership is a necessary precedent to any judgment against the individual partners for payment of partnership obligations. A partner's property may be subjected to payment of a

partnership liability only when the assets of the partnership are insufficient to pay the partnership's obligation. *Southard v. Oil Equipment Corp.*, 296 P.2d 780, 784 and Syl. 4 (Okla.1956).

■ The evidence submitted by the parties does establish that if there is an indemnity agreement Mr. Frates made that agreement as a member of the Frates Group. Mr. Frates points out that in its first motion for summary judgment, the FDIC alleged that the Frates Group is a partnership. *See* Doc. No. 178, p. 3, ¶ 1(a). Relying on *Southard,* Mr. Frates then argues that the FDIC cannot obtain a judgment against him because the FDIC has not yet obtained a judgment against the Frates Group partnership. There is, however, no evidence in the record that the Frates Group, if it is a partnership, is still in existence, or that the Frates Group would have sufficient assets to pay a damage award in this case.

The allegation in the FDIC's first motion for summary judgment that the Frates Group is a partnership is not substantiated by a citation to any part of the summary judgment record. The FDIC's counsel has since stated that the allegation in the first motion for summary judgment was made casually to provide general background information, without realizing that the organizational structure of the Frates Group would be significant. Mr. Frates conveniently admits that the Frates Group was a partnership as alleged by the FDIC in its first motion for summary judgment. However, "[f]or any other purposes," Mr. Frates denies that the Frates Group was a partnership. *See* Doc. No. 372, Request for Admissions, Frates' Corrected Response to Plaintiff's First, Second and Third Requests for Admission, p. 6, ¶ 11. In essence, Mr. Frates argues that the Frates Group is a partnership because the FDIC, without any evidentiary support, once said that the Frates Group was a partnership. Mr. Frates would have the Court ignore all other evidence in the record which strongly suggests that the Frates Group was not in fact a partnership.

As discussed above, the term "Frates Group" as used throughout this litigation is ambiguous, absent an explicit definition of the term when it is used. There is, therefore, a material question of fact regarding the organizational structure of the Frates Group—was the Frates Group a partnership, by estoppel or otherwise; a joint venture; or some other entity? If the Frates Group is a partnership, the Court must then determine whether the FDIC is first required to obtain a judgment against the partnership before it can recover against Mr. Frates. This determination itself involves a material question of fact—does the Frates Group have sufficient assets to cover any judgment in this case or is it now a defunct organization? The undersigned recommends that, if the Second Claim for Relief survives summary judgment, the issues of State's damages and the Frates Group's organizational structure be presented to the jury. Whether Mr. Frates' is presently liable absent a prior judgment against the Frates Group can then be ruled on as a matter of law by the Court, depending on what the jury finds with regard to the organizational structure of the Frates Group.

The summary judgment record presents questions of fact regarding the precise organizational structure of the Frates Group. Nevertheless, the summary judgment record does establish that no matter how constituted Mr. Frates was a member of the Frates Group. Mr. Frates' arguments suggest that he believes that his liability with the other members of the Frates Group is separate, rather than joint and several. In Oklahoma, however, there is a presumption in favor of joint and several liability when those who unite in a promise "receive some benefit from the consideration." 15 Okla.Stat. § 175. Assuming there is an enforceable indemnity promise, Mr. Frates has offered no argument or

evidence which would rebut the presumption in § 175.

Even if Mr. Frates' liability *vis à vis* the other members of the Frates Group is in fact separate, there are still material questions of fact which preclude the entry of summary judgment on this issue. If Mr. Frates' liability is separate, it would presumably be limited to his percentage share of interest/ownership in the Frates Group. Mr. Frates suggests that his share of liability would be 1.1844% because that is the interest he owned in the Sierra property. If the Sierra property was the only asset held by the Frates Group and if Mr. Frates' liability is in fact separate, then Mr. Frates' argument would be reasonable. There is, however, no evidence of record which clearly establishes the assets of the Frates Group or Mr. Frates' percentage share of the Frates Group. Again, if the Second Claim for Relief survives summary judgment, the undersigned recommends that the issue of State's damages be submitted to the jury, with the Court deciding as a matter of law what Mr. Frates' share of the damages shall be after hearing all of the evidence.

### f. No Damages Suffered by State

The Sierra property was worth between $10.6 and $15.6 million, depending on which appraisal is used, when State acquired the Sierra property on December 30, 1986. State eventually developed, subdivided and sold the Sierra property for in excess of $30 million. Mr. Frates argues that, even if the $7,244,409.23 paid to Kaiser out of the Kaiser escrow account is deducted, State made a profit of between $7 and $12 million on the Sierra property. Assuming there is an indemnity agreement enforceable against Mr. Frates, Mr. Frates argues that he is not liable on the agreement because State made a profit on the Sierra property and did not suffer a loss.

Mr. Frates' argument is specious for at least two reasons. First, the fact that State made a $7 to $12 million profit on the Sierra property is by no means an undisputed fact. Mr. Frates has failed to account for the expenses State incurred developing the Sierra property. Mr. Frates has also failed to account for the expenses State incurred in defending the Kaiser litigation. Second, if there is an indemnity agreement in this case, as opposed to a deed warranty, it is an agreement to indemnify State for losses incurred as a result of the Kaiser litigation. The Kaiser litigation resulted in a payment of $7 million from State to Kaiser. Whether the money paid by State to Kaiser be considered profits or otherwise, it is money which is no longer in State's coffers. The undersigned fails to comprehend how the departure of $7 million from State's coffers can be viewed as anything other than a loss to State.

### g. Terms of Indemnity Agreement Not Definite

Citing *Allied Hotels Co. v. H & J Const. Co.*, 376 F.2d 1 (10th Cir.1967), Mr. Frates argues that the terms of the indemnity promise alleged in this case are so indefinite that the promise cannot be enforced. *Allied Hotel* permits terms to be read into an indemnity contract when those terms are "warranted by a reasonable interpretation [of the contract]." *Id.* at 2. This would include those terms added by 15 Okla.Stat. § 427, which specifically provides rules of interpretation for indemnity contracts. The undersigned does not agree that the terms of the indemnity agreement alleged in this case are so indefinite that the promise cannot be enforced if the jury were permitted to determine whether such an agreement in fact exists.

The FDIC argues that Mr. Frates or the Frates Group agreed to indemnify State from "any loss" relating to the Sierra property resulting from the Kaiser adversary proceeding. Mr. Frates argues that there is no evidence of what the term "loss" means. In the same vein as his "no damages" argument addressed in the preceding section, Mr. Frates argues that the

term loss is "commonly understood to mean loss on the purchase side." Doc. No. 364, p. 19. In other words, Mr. Frates argues that a "loss" would occur only if State lost more than the amount of appreciation in value that the Sierra property experienced since its acquisition by State. At most, Mr. Frates' argument creates a question. of fact that must be resolved by the jury. There is more than sufficient evidence in the record to permit the jury to conclude that the term "loss" included "any" loss, including the loss of profits State was to receive on the sale of the Sierra property.

Mr. Frates argues that the indemnity promise did not adequately define his right to defend or State's right to settle the Kaiser litigation. These terms are, however, supplied by 15 Okla.Stat. § 427 and *Chicago, R.I. & P.R. Co. v. Dobry Flour Mills*, 211 F.2d 785 (10th Cir.1954). *See* discussion in section III(C)(2)(c).

Mr. Frates argues that the identity of the indemnitors is also not sufficiently described. The undersigned does not agree. There is sufficient evidence in the record for the jury to conclude that the indemnitors at least include Mr. Frates and more likely than not included the original investors who contributed the Sierra property to Equivest. At most, Mr. Frates' argument creates a question of fact that must be resolved by the jury.

### D. CONCLUSION

There are material questions of fact regarding the existence of an oral indemnity agreement by Mr. Frates or the Frates Group to indemnify State against any loss suffered in connection with the Sierra property as a result of the Kaiser litigation. However, the FDIC has failed as a matter of law to demonstrate that the agreement, if it can be established, is one that can be enforced through an action at law. The FDIC cannot validate the alleged agreement through either the doctrine of consideration or the doctrine of promissory estoppel. For that reason, the undersigned recommends that summary judgment be granted in favor of Mr. Frates on the Second Claim for Relief in the FDIC's Third Amended Complaint.

### RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Mr. Frates' motions for summary judgment (doc. nos. 215 and 356) be **GRANTED** and that the FDIC's motions for summary judgment (doc. nos. 178 and 369) be **DENIED** as to the First and Second Claims for Relief in the FDIC's Third Amended Complaint.

### OBJECTIONS

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of his/her review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so within ten days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. United States*, 950 F.2d 656 (10th Cir.1991); and *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir.1996).

November 20, 1998.